In re ST. LOUIS
GLOBE–DEMOCRAT, INC., Debtor.

Bankruptcy No. 85–01605(2).

United States Bankruptcy Court,
E.D. Missouri, E.D.

Dec. 9, 1985.

Gerald A. Rimmel, Clayton, Mo., for debtor.

Morris J. Levin, St. Louis, Mo., for the Guild.

William M. Howard, St. Louis, Mo., for petitioning creditors.

Lloyd A. Palans, Clayton, Mo., for Veritas.

Steven Goldstein, St. Louis, Mo., for Citicorp.

Irvin A. Friedman, St. Louis, Mo., for Creditors' Committee.

Edwin S. Jones, St. Louis, Mo., trustee.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### BACKGROUND

On August 18, 1985[1], fourteen employees of the St. Louis Globe-Democrat, Inc. (Globe) filed an Involuntary Creditors' Petition in Bankruptcy pursuant to Chapter 11 of Title 11, United States Code.[2] Initially, the Debtor had filed its Answer denying the allegations of the involuntary petition and requested that it be dismissed. Subsequently, on September 26 the Debtor filed an Amended Answer in which it consented to the entry of an order for relief. Accordingly, the Court entered its Order on September 26 granting relief under Chapter 11.

Only one week after the involuntary petition was filed and prior to the Court's granting relief under Chapter 11, the petitioning creditors, on the 26th of August, filed a Motion For Appointment Of A Trustee (Motion 001), which was heard on September 3. At the conclusion of the testimony, the movant stated it was seeking the appointment of a Trustee pursuant to 11 U.S.C. § 1104(a)(1) and not Section 1104(a)(2). If a Trustee were not appointed the movant reserved its right to pursue, in the future, the appointment under section 1104(a)(2). The Court announced it would deny the request for the appointment of a trustee, and on the following day a written order was entered which stated, "... that the petitioning creditors failed to carry their burden of proof to justify, *at this time*, the appointment of a trustee pursuant to 11 U.S.C. § 1104." (Emphasis Added)

Prior to the filing of the involuntary petition, the Globe's policy was to pay their employees weekly, on Wednesday, for the week ending on the preceding Friday. However, as of August 19 the Globe had fallen behind in their payment schedule. On August 27, 1985, the St. Louis Newspaper Guild, Local No. 47 (Guild) filed a motion to require the Globe to make current payments for post-petition wages and earnings. After due notice, the motion was heard on September 17. Although the Globe owed its employees for wages earned prior to August 19, the Globe and Guild agreed that payroll checks issued after that date would be applied to post petition employment. Based on this formula, it was stipulated that the Globe had failed to pay wages that were due on Wednesday, September 13, for services rendered between September 2 through September 8. Since the Globe did not anticipate meeting their next payroll until September 20, the Debtor was nearly two weeks behind on September 17, the day of the hearing. In addition, the collective bargaining agreement required the Globe to withhold union dues from its hourly employees and forward the dues on the 20th

---

1. All dates herein refer to the year 1985 unless otherwise noted.

2. On September 20, 1985 eleven additional creditors, including trade creditors, filed their Motion For Joinder Of Additional Petitioners To Creditors' Petition.

of each month for the preceding month.[3] During the hearing the parties tried to settle the Guild's motion; however, they could not agree upon a schedule of compliance dates. Finally, the attorney for the Globe assured the Court that the Globe was committed to returning to the traditional pay schedule by not later than October 23 and that during the interim period would make a late, but a weekly payroll. Having heard the arguments of counsel and considering the evidence, the Court issued its Order on September 18, which provided:

1. The Globe Democrat shall pay the wages due and payable on September 13, 1985 not later than September 20, 1985 for the payment of wages earned between September 2, 1985 through September 8, 1985.

2. The Globe-Democrat shall make at least one payment of wages to its employees each week.

3. The Globe-Democrat shall as soon as practicable, but in no event later than October 9, 1985, change its date of payment for payroll to each Wednesday, so that a "wage holdback" shall not exceed five days following the close of the preceding weekly pay period (which shall end each Friday of the preceding week.)

4. The Globe-Democrat shall remit Guild membership dues to the Guild in compliance with Article I, paragraph 5(A) of the collective bargaining agreement.

The Debtor not only failed to comply with the above mentioned Order by October 9, it also failed to comply by October 23, which was the date when the Globe's attorney had assured the Court that it would return to the traditional pay schedule. On October 10, the Guild filed Motion No. 007, wherein it seeks the appointment of a trustee to administer the estate and an order directing the debtor to comply with the prior order of the Court that it make regular weekly payment of salaries and wages currently as they accrue and limit wage holdbacks for a period not to exceed five days. Thereafter, Veritas Corp., a party in interest herein and an assignee of Montgomery Elevator Co., who was a creditor of the Debtor, filed two motions titled: Joinder In Motion For Appointment Of A Trustee with the Guild's Motion No. 007 and Motion To Eliminate Debtor's Exclusive Period For Filing Plan Of Reorganization. The petitioning creditors then filed, on November 20, a Motion To Reconsider Denial Of Its Motion For Appointment Of A Trustee, Motion No. 001.[4] These motions came on for hearing before the Court on November 27 and November 29. The Court, having heard arguments of counsel, the testimony of several witnesses, and having reviewed the pleadings and the record in this case, grants the motions for appointment of trustee and renders the following opinion, incorporating finding of facts and conclusions of law.

### FACTS

The St. Louis Globe-Democrat, Inc. was founded in 1852 and is one of two daily newspapers remaining in the City of St. Louis. In the latter part of 1983, the former owner of the Globe announced it would permanently close the newspaper. Later the owner agreed to sell. On December 20, 1983, Gluck Media, Inc. was founded by Jeffrey M. Gluck and his wife, Debra McAlear Gluck. After the purchase of the Globe was completed, the name of Gluck Media, Inc. was changed to the St. Louis Globe-Democrat, Inc. The new Globe commenced business in February, 1984. The Glucks are the sole stockholders of the Globe, with Jeffrey serving as President/Publisher and Debra as Vice President/Associate Publisher.

---

**3.** Although the Globe had been withholding the union dues in compliance with the collective bargaining agreement, it had failed to forward any of the dues since June 18, 1985.

**4.** In order to expedite the hearing, the parties consented to the Court taking into consideration the testimony and exhibits previously adduced during the September 3 hearing of Motion 001. Therefore, the present decision is based on all testimony, evidence and arguments of counsel presented on September 3, November 27 and November 29, 1985 in Motions 001 and 007.

The Globe and the St. Louis Newspaper Guild, Local No. 47 are parties to a collective bargaining agreement (Contract) that sets forth the wages, terms and conditions of employment of all Guild members employed by the Globe, executed as of June 17, 1985, effective March 1, 1985, and presently in full force and effect until December 31, 1988. Article I, paragraph 5(A) of the Contract authorizes the Globe to deduct from the salary of an employee, an amount equal to all periodic Guild membership dues, as certified by the Treasurer of the Guild, for each calendar month and the amounts deducted to be remitted to the Guild not later than the 20th day of the following month. Article XI INSURANCE AND WELFARE of the Contract provides in part:

1. The Publisher agrees to maintain the present plan of life insurance for all regular, full-time employees covered by this contract who elect to participate therein.

2. The Publisher agrees to make available for present employees and their spouses and/or dependent children up to 23 years of age, if any, the St. Louis Globe-Democrat Inc., Employee Health and Life Insurance Plan, insured by General American Life Insurance Company—comprehensive major medical (CMM) plan I–E; $150 deductible, $1,000,000.00 major medical.

The Publisher agrees to pay the full premium for said coverages.

Gluck admitted in his testimony on September 3 that the Debtor owed the Guild approximately $40,000 for union dues which it withheld from its employees' wages but failed to forward to the Guild as required by the collective bargaining agreement. The Debtor's Statement Of Financial Affairs indicates the sum to be $28,-771.89 as of August 18, 1985. During the September 17 hearing, Arby Baker, Secretary for the Guild, stated that the last payment of union dues made by the Globe was on June 18 and the average monthly dues was approximately $8,000. In a similar manner, the Debtor withheld donations to the United Way from employees' wages in the amount of $7,154.22 and failed to forward those charitable contributions to United Way.

David L. Metzler, Vice President in charge of Finance for the Globe, joined the Debtor in late July. He testified that the Debtor had allowed the Employee Health and Life Insurance Plan, insured by General American Life Insurance Company, to lapse in mid-July even though the Globe was required, by the collective bargaining agreement to pay the full premium. In fact, the Debtor allowed all of the various types of insurance to lapse, including voluntary life insurance. Gluck candidly admitted that the Globe has continued to maintain both his life insurance and health insurance during this period. Apparently, Citicorp Industrial Credit, Inc. (Citicorp) required the Debtor to maintain life insurance on Gluck as part of a loan agreement. However, no explanation was provided as to why the Globe maintained health insurance on Gluck and not on the hourly workers. Unfortunately, neither the Globe nor General American Life Insurance Company notified the employees that their health coverage had lapsed. As a result, some claims will be filed against the Globe by employees who incurred medical expenses as a result of these lapsed policies.

The Debtor has also withheld employee withholding taxes and then failed to forward those funds to the various taxing authorities. In Gluck's September 3 testimony, he estimated that the Globe was indebted to the State of Missouri in an approximate sum of $185,000.00, which he felt represented several quarters of withholding taxes. Apparently, the Globe entered into a delinquent tax payment agreement with the Missouri Department of Revenue on or about August 29, 1985, wherein it was acknowledged that the settlement was, "... for the purpose of liquidating the certified delinquent withholding tax liability due the State of Missouri for the period(s) July, 1984 through and including May, 1985, for the sum of $186,735.49, including interest and additions to pay." Gluck also acknowledged that the Debtor owes some

money to the City of St. Louis, which represents both funds withheld from employee wages and head tax. The Debtors' Statement Of Financial Affairs states that the Globe owes the City of St. Louis $74,331.40 for employee withholding city earnings taxes and the federal government $41,995.99 for employee federal withholding and F.I.C.A. taxes. The record is unclear as to the time period covered by both the federal and city earning taxes. The problem has been somewhat alleviated by the fact that Citicorp now forwards the federal and state withholding taxes when the payroll checks are issued, before the Globe receives money from Citicorp. This new procedure was instituted for Missouri withholding taxes in May and for federal withholding taxes around March.

As previously indicated, the Globe's traditional policy was to maintain a five day wage holdback. Early in September Gluck explained that they had just initiated a two week wage holdback policy because they anticipated a shortage of cash. Although the Globe's attorney assured the Court that they were committed to returning to a five day wage holdback, the opposite occurred. Since the Debtor was unable to pay the entire staff, it proceeded to pay the various departments by rotation, when the funds were available. If the funds on hand were not sufficient to pay the next department on the rotation list, they would skip to the next smaller department on the list. The parties stipulated that as of November 29 none of the staff employees had been paid for the services they rendered for the weeks ending November 1, 8, 15, 22, and 29, while less than half were paid for the week ending October 25.[5] When Metzler was asked when the employees would receive their next pay check, he responded whenever the funds are available. He explained that it is difficult to make any financial forecast or predictions as to when

funds would be available since it depended on the volume of advertising, which fluctuates. In fact, Metzler said the Debtor cannot project available funds beyond one day.[6]

In 1984, the Debtor reported a loss of $2,100,224.00 of taxable income on its U.S. Corporation Income Tax Return, line 30, form 1120. The Globe's Statement of Income for the year ending December 28, 1984 showed a net income loss of $1,725,108.00. During this same calendar year the Globe paid salaries to Jeffrey Gluck in the amount of $168,077.00 and $46,000.00 to his wife, Debra. Initially, in early 1984 the Globe authorized a rate of pay in the sum of $115,000 per year for Mr. Gluck, until July or August, 1984, when it was increased to $230,000.00. The authorized pay schedule for Mr. Gluck remained at $230,000.00 until November, 1985, when it was reduced by thirty per cent (30%) and management salaries were reduced by ten per cent (10%). During this entire period Mrs. Gluck was authorized to receive $52,000.00 per year.

The Globe's Statement of Loss for 1985, as of August 9, is $1,442,172.00. As of August 19, for the calendar year of 1985, the Globe had paid Mr. Gluck $236,865.20 and $42,000.00 to Debra Gluck. The payment to Mrs. Gluck represents salary; but, it is unclear what portion of the $236,865.20 represents salary or payment of loans to Mr. Gluck or to one of his three affiliates: Missouri Life, Saturday Review and Family Journal. He recalled that neither he nor his wife took their salaries for three months in 1985 and some portion of the $236,865.20 represents the payment of loans by the Globe to either himself or one of these three affiliates. He attributes his lack of knowledge and information concerning his financial condition to the fact that

---

5. The record is silent as to whether management was paid during this same pay period.

6. On August 21, the Globe sought and was granted a borrowing order from Citicorp. The Globe's application to borrow money stated, "... that in order to continue the operation of its business, it will be necessary for it to borrow money and otherwise be extended credit for the payment of wages, salaries and operating expenses, including but not limited to the purchase of printing services and the purchase of inventory and supplies."

he authorized the Globe's general manager to withdraw funds from Missouri Life and transfer them to the Globe account without seeking his permission on each transaction. Thus, he asserts that funds were transferred without his knowledge and he is therefore unable to determine what portion of the $236,865.20 was income during the first eight months of 1985.

Approximately four months after the new management took over the Globe, the Debtor's first check was dishonored. Gluck said he recalled the day vividly because the incident caused a great deal of attention. The Debtor's first treasurer decided to utilize the "float". Gluck testified he was aware of this decision and did nothing to stop this new policy, since he felt they had no choice. David Metzler, the Globe's current executive in charge of Finance, testified the use of the "float" was not only common in the business community, but is considered sound management. If sufficient funds are maintained in a checking account to cover all outstanding checks, a certain percentage of that deposit will simply lie idle and not earn interest. Metzler explained that a businessman who follows good management principles will study their checking account for several months until they can predict the average time it takes for their checks to clear. When this clearance time is known, it is possible to draw the checking account down to a point where there are sufficient funds to honor the incoming checks. The percentage of funds that are removed from the account may then be used to pay bills or invest in a manner considered advantageous to the holder of the checking account. Of course, if the account is excessively depleted, the checks will not be honored due to insufficient funds. Gluck and Metzler freely admitted that they issued pay checks when they knew the checking account lacked sufficient funds to cover those checks. Metzler explained that they were simply trying to utilize the "float". The checks were issued at a time when they anticipated that a deposit would arrive at the bank before the arrival of the payroll check. Metzler testified they simply mis-

calculated, that is, in some cases he said the "float" was calculated "a little slim". On the day the involuntary petition was filed, August 19, the Globe had $365,076.32 in outstanding dishonored payroll checks. The following is a review of the Globe's monthly overdrafts as listed on its balance sheet under current liabilities:

| | |
|---|---|
| July 12, 1985 | $517,423 |
| June 14, 1985 | 823,208 |
| May 17, 1985 | 792,750 |
| April 19, 1985 | 639,422 |
| March 22, 1985 | 696,430 |
| February 22, 1985 | 836,108 |
| January 25, 1985 | 689,250 |
| December 28, 1984 | 578,521 |
| November 30, 1984 | 1,295,141 |
| October 26, 1984 | 1,020,304 |
| September 28, 1984 | 905,885 |
| August 31, 1984 | 1,051,785 |
| July 27, 1984 | 745,327 |
| June 29, 1984 | 493,539 |
| May 25, 1984 | 467,968 |

The Globe maintained several checking accounts at the Landmark Bank in St. Louis. The general commercial checking account #2097 and the payroll checking account #2089 are inactive. The general commercial checking account #4235 and the payroll checking account #4820 are active accounts. The monthly bank statements for account #2089, January through August, 1985; and #4235 and #2097, July through August, 1985 were introduced into evidence. A review of these documents reveals a substantial dollar amount of checks were dishonored for insufficient funds. Veritas' attorney asserted, in his questioning of Metzler, that these documents represented 5,643 dishonored checks amounting to $4,264,038.66. Mr. Metzler did not challenge the dollar amount, but he pointed out that there simply were not that many separate checks that were dishonored. In fact, it was impossible to determine the exact number of checks since many of the checks that were dishonored on first presentment were simply presented again until honored. Since deposits were usually made to the accounts twice a day, it was entirely possible that a

check that was dishonored in the morning would clear in the afternoon. The Landmark Bank charged the Globe $10.00 for each overdraft. The following is a list of overdrafts and the charges on two of the accounts between January and July, 1985.[7]

| Month | General Account #2097 | General Account #4235 | Charges |
|---|---|---|---|
| January | 328 items | | $ 3,280.00 |
| February | 368 items | | $ 3,680.00 |
| March | 692 items | | $ 6,920.00 |
| April | 792 items | | $ 7,920.00 |
| May | 465 items | | $ 4,650.00 |
| June | 651 items | | $ 6,510.00 |
| July | 121 items | | $ 1,210.00 |
| | | 224 items | $ 2,240.00 |
| Total | | | $ 36,410.00 |

The Globe's monthly general account (#4235) bank statements for September and October along with a computer printout account history for November 1 through November 25 indicate the continued use of the "float" in such a manner as to produce a total of $116,283.99 in overdrafts. The overdraft is represented by a date and the total dollar amount that was dishonored. Since each daily entry may include more than one check, it is not possible, at this time, to determine what the $10.00 overdraft charge will eventually cost the Globe.[8] The following is a list of these overdrafts:

| | | | |
|---|---|---|---|
| 9/3 | $9,459.95 | 10/7 | $2,654.20 |
| 9/4 | 6,331.40 | 10/8 | 3,209.58 |
| 9/5 | 9,610.72 | 10/9 | 1,200.00 |
| 9/9 | 5,434.69 | 10/29 | 661.50 |
| 9/10 | 3,765.29 | 10/29 | 8,000.00 |
| 9/11 | 5,732.75 | 10/29 | 1,192.90 |
| 9/12 | 1,420.00 | 11/4 | 8,000.00 |
| 9/16 | 869.50 | 11/5 | 978.54 |
| 9/17 | 8,952.27 | 11/5 | 2,905.00 |
| 9/18 | 5,998.00 | 11/5 | 8,000.00 |
| 9/19 | 1,632.00 | 11/12 | 8,000.00 |
| 9/26 | 1,400.00 | 11/19 | 8,000.00 |
| 10/2 | 2,010.70 | 11/21 | 865.00 |

The Globe's financial records have not been audited by an independent accounting firm. In fact, the closed commercial general checking account was never reconciled and only three months ago did the Debtor reconcile the old payroll checking account and the open commercial general checking account. The Debtor depends on its internal accounting system to provide balance sheets and income statements, which Gluck commented left much to be desired, but were the most accurate records that they could produce.

There has been a steady flow of employees, from editors to copy messengers, who have left the Globe since the Involuntary Petition was filed. Gluck did not believe this was a serious problem since he felt the staff was too large and he always had applications on file of those seeking employment. The Debtor also insisted that the last three months would show a profit when the final records were completed. Gluck also insisted that when the Involuntary Petition was filed and as each motion is filed and heard, the publicity results in a lowering of advertising revenues, through no fault of management.

## CONCLUSIONS OF LAW

The petitioning creditors, the Guild, and Veritas Corp. assert that the conduct of the Globe and its management mandates this Court appoint a trustee pursuant to 11 U.S.C. § 1104(a)(1) I agree. Section 1104, *Appointment Of Trustee Or Examiner,* provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or

---

7. In June, the Globe borrowed $800,000.00 from the First National Bank of Chicago. These funds were used to pay withholding taxes, pending bills and operational expenses. The infusion of funds was expected to solve the Globe's financial problems, but the losses were substantial and the funds were dissipated at the same time the Debtor's checks continued to "bounce".

8. The overdraft service charge is calculated at the end of each month. It was not completed at the conclusion of this trial.

after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.[9]

■ The Debtor has correctly argued that the appointment of a trustee in a chapter 11 case is an extraordinary remedy. *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bkrtcy.E.D.N.Y.1980); *In re Loyd W. Ford*, 36 B.R. 501 (Bkrtcy.E.D. Ky.1983). It is well established there is a strong presumption that a debtor in possession in a reorganization case should be permitted to continue to control and manage its estate. *La Sherene, Inc., d/b/a The Sunshine Corporation*, 3 B.R. 169 (Bkrtcy.N.D.Ga.1980). Accordingly, the movants in this case have the burden of proof to show that cause exists to justify the appointment of a trustee under 11 U.S.C. § 1104(a)(1). *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bkrtcy.E. D.N.Y.1984); *In re Crescent Beach Inn*, 22 B.R. 155 (Bkrtcy.D.Me.1982). It is not sufficient to simply show that the debtor is heavily in debt or has exercised poor business judgment. After all, it is reasonable to assume that the majority of businesses that arrive in chapter 11 have exercised a certain degree of incompetence or mismanagement. However, where clear and convincing evidence is offered to prove that "cause" exists, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, then the Court has no discretion but must appoint a trustee. *In re Ford, supra; In re Main Line Motors*, 9 B.R. 782 (Bkrtcy.E.D.Pa.1981); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bkrtcy.E.D.Pa.1981). In the instant case, the movants have met their burden.

■ In the present case it isn't necessary to carefully delineate whether the "cause" consists of fraud or dishonesty as opposed to incompetence or gross mismanagement. Obviously, the result is the same since the finding of any one of these causes mandates that this Court appoint a trustee. Having considered all the evidence of record, I must conclude that if the conduct of the Globe's current management is not fraudulent and dishonest, it is at a bare minimum a clear example of incompetence and gross mismanagement.

In its capacity as an employer, the Globe withheld money from its employees in the form of union dues on behalf of the Guild; withholding taxes on behalf of the United States, State of Missouri and the City of St. Louis; and charitable contributions on behalf of United Way. In its fiduciary role as the keeper of these funds, the Globe did not have the right to use these withholdings. The money simply did not belong to the Debtor. The total amount that was withheld is in excess of $300,000. In essence, when the Globe used these funds, it was financing its business without receiving the permission of the true owners of the money and without paying them interest. Of course, the use of some of the withholdings may be subject to interest and penalty charges. Such conduct is both dis-

---

**9.** Veritas has also urged that the Court appoint a trustee under § 1104(a)(2). It should be noted that (a)(2) is written in the conjunctive and thus requires a finding that the appointment is in the interests of creditors, any equity security holders, *and* other interests of the estate. The Court is firmly convinced that the appointment is in the best interest of the creditors and other interests of the estate. However, upon the consideration of the evidence that was adduced, it is impossible to find that the appointment of a trustee is in the best interest of *any* equity security holders since, as sole shareholders, it appears that Mr. and Mrs. Gluck are the only equity security holders in the Globe. Since they are opposed to the appointment of a trustee, it is unreasonable under these circumstances to appoint a trustee pursuant to § 1104(a)(2). 2 *Collier Bankruptcy Manual* ¶ 1104.02(4).

honest and gross mismanagement of the affairs of the Debtor.

Even if one were to accept the argument that the utilization of the "float" is not only common, but also represents sound business judgment, such an argument cannot provide the Globe with solace under the facts of this case. The Debtor did not use a "float". It was a "submerged flood". The level of the bank balance was submerged beneath the surface. It was not "floating". Gluck and Metzler freely admitted that they issued checks when they knew the funds were insufficient to cover those checks. Their defense was that they had reason to anticipate the deposit would arrive before the checks. When the bank statements and records are reviewed, it is clear their anticipation was ill founded. The supervision of a checking account in this manner is a clear indication of incompetence and gross mismanagement. The bank charged $10.00 for each dishonored presentment. The bank's final service charge was not calculated at the time of this hearing. However, the evidence would support the argument that these service charges for overdrafts were at least $50,-000.00 and possibly as high as $100,000.00. When a company suffers from a severe cash flow problem such as the Globe, it is difficult to understand how one can argue that the use of the "float" in this fashion represents good business judgment, when the result is further diminution of much needed assets by expensive overdraft charges. It is interesting to note that this problem has continued to the present. Certainly the recipients of these checks, regardless if they are employees or trade creditors, will lose faith in management when faced with a continual dishonorment of a debtor's checks. The entire staff of the Globe has not been paid for five weeks of service. Over half of the staff has not received a payment for six weeks. Metzler could not even inform the Court as to the date of the next payroll. He candidly admitted that the Globe cannot predict beyond one day as to what funds will be available. Gluck complained that his financial records left much to be desired. The

inability to project income with some degree of certainty and the failure to maintain accurate books and records also represents incompetence and gross mismanagement. *In re Crescent Beach Inn, supra; In re Philadelphia Athletic Club, Inc., supra.*

Counsel for the Debtor argues that if a trustee is appointed, the Globe will close and be liquidated. There was not a scintilla of evidence to support the assertion that Gluck could save this newspaper. In fact, under his helm the Globe has continued to deteriorate. The average daily circulation has dropped from a high of 223,018 in April, 1984 to 161,981 in October, 1985. In 1985, with the exception of March, the average daily circulation decreased each month. Advertising revenues have also decreased while total liabilities have increased substantially.

All parties to the case profess a common goal of saving the newspaper. That goal cannot be reached under Mr. Gluck's leadership. The only possible means of saving the Globe and minimizing any further loss to the creditors is to appoint an independent operating trustee.

Accordingly, the Court finds that sufficient cause exists pursuant to 11 U.S.C. § 1104(a)(1) to appoint a trustee. Therefore, the request of the Petitioning Creditors, the Guild and Veritas Corp. for an order appointing an operating trustee is granted.

An Order consistent with this Memorandum Opinion will be entered this date.

## ORDER

The motions of the Petitioning Creditors, The St. Louis Newspaper Guild, Local No. 47, and Veritas Corp. for the appointment of a Trustee, along with the Debtor's answer and objections were heard on November 27 and 29, 1985, after due notice had been given to the Debtor, all creditors and other parties in interest. Upon consideration of the evidence that was presented at the hearing and arguments of counsel, the Court finds that good cause exists for the

appointment of an operating trustee, pursuant to the provisions of Section 1104(a)(1) of the Bankruptcy Code. In accordance with the findings of fact and conclusions of law filed this date in the Court's Memorandum Opinion, it is

ORDERED:

1. That Edwin S. Jones, a disinterested person, be and he hereby is appointed operating trustee of the estate of the above-named Debtor, and he is authorized and directed forthwith upon his qualification, to take possession of the property of the Debtor, to operate its business and to perform all of the duties of a Trustee prescribed by section 1106(a) and elsewhere in the Bankruptcy Code.

2. The bond of the Trustee is hereby fixed at Ten Thousand Dollars ($10,000.00).

3. The Trustee shall file with the Court a status report as to his findings of the viability of the Debtor for reorganization and any other recommendations the Trustee may have, not later than January 18, 1986.

IT IS FURTHER ORDERED that Jeffrey M. Gluck and his wife, Debra McAlear Gluck, forthwith surrender the possession of the property of the Debtor to the Trustee and cease participation in the daily operations of the Globe, except as requested by the Trustee.