In re **PROFESSIONAL ACCOUNTANTS REFERRAL SERVICES, INC.,** a Colorado corporation, Debtor.

Bankruptcy Case No. 92–15837–SBB.

United States Bankruptcy Court,
D. Colorado.

June 8, 1992.
Nunc Pro Tunc May 26, 1992.

Paul D. Stuber, Nueman, Cobb & Cornelius, Boulder, Colo., for Involuntary Chapter 11 debtor.

Bonnie A. Bell, Katch, Wasserman & Jobin, Denver, Colo., Harvey Sender, Harvey Sender & Associates, P.C., Englewood, Colo., for petitioning creditors.

Leo Weiss, U.S. Trustee's Office, Denver, Colo., for U.S. Trustee.

Brian Beradini, Denver, Colo., for United Bank of Boulder.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Renewed Motion for Appointment of a Trustee filed by Gerald Mahoney, Irwin Williams, Ron Harper, and Trey S. Holley (the "Creditors" or "Petitioning Creditors") on May 22, 1992 (the "Renewed Motion"). The Petitioning Creditors seek emergency appointment of a trustee in this, an involuntary bankruptcy case, recently commenced pursuant to 11 U.S.C. § 303.

Briefly, before the Court is an issue of first impression in this District—may a court appoint a trustee in an involuntary Chapter 11 case during the "gap" period, or prior to the entry of an order for relief, pursuant to 11 U.S.C. § 1104(a)(1)? This Court holds that, under the circumstances presented, the appointment of a trustee is appropriate.

The Court, having reviewed the pleadings and exhibits, having heard testimony, and having conducted two hearings in this matter, makes the following findings of fact and conclusions of law.

## I. BACKGROUND.

On May 8, 1992, the Petitioning Creditors filed an Involuntary Chapter 11 Petition against Professional Accountants Referral Services, Inc. ("PARS"). Concurrently, the Petitioning Creditors filed an Emergency Motion for the Appointment of a Trustee seeking the appointment of a trustee based on allegations that the assets of PARS had been dissipated and/or diverted by PARS management. This Court held a forthwith hearing on the Emergency Motion on May 12, 1991 and determined that insufficient evidence and offers of proof had been presented by the Creditors to support the appointment of a trustee on an emergency basis. Consequently, this Court denied the Petitioning Creditors' Motion for Appointment of a Trustee without prejudice but entered an order allowing the Petitioning Creditors to review the books and records of PARS.

Following the hearing on the Emergency Motion, the Petitioning Creditors commenced their review of the books and records of PARS. Based on that review, the Petitioning Creditors filed their Renewed Motion on May 22, 1992. Although an order for relief on the Involuntary Petition had not entered and the alleged Debtor had not yet filed an answer contesting the Involuntary Petition, this Court held a hearing on the Renewed Motion on May 26, 1992.[1] At the hearing, the Court heard testimony, examined the evidence, and heard legal argument on the issue of appointing a Chapter 11 trustee *before* entry of an order for relief had entered.

The Court found, this time, that the substantial evidence presented by the Creditors justified the immediate appointment of a trustee for the alleged Debtor, on an interim [2] and emergency basis. This Court concluded that, under the circumstances

---

**1.** The alleged Debtor, PARS, had not yet filed an answer or other responsive pleading in opposition to the Involuntary Petition, in accordance with Rule 1011, Fed.R.Bankr.P., nor was it compelled to do so, prior to the May 26 hearing.

**2.** The Court notes the appointment could be short-term, in part, because current management might immediately seek to regain control and management of the alleged Debtor (*see,* 11 U.S.C. § 303(g)) or the Involuntary Petition could still be dismissed after hearing. 11 U.S.C. § 303(h); Rule 1011(b), Fed.R.Bankr.P.

and given the quality of evidence submitted, the Court could and should appoint an interim trustee even though no order for relief had yet been entered on the Involuntary Petition.

The instant Memorandum Opinion and Order supplements the findings of fact and conclusions of law stated on the record May 26, 1992.

## A. FACTUAL ANALYSIS.

PARS is a Colorado corporation allegedly formed sometime in October 1989.[3] The business, since its inception, has been run by Terry Toler, an accountant and its president and 90% shareholder. The remaining 10% of PARS' stock is owned by Lisah Brown, Mr. Toler's one-time fiancée.[4] PARS is principally a telemarketing firm that was designed to arrange a given number of appointments for accountants with prospective clients for a monthly fee. The PARS contracts made certain guarantees to the accountants which, if not met, would entitle them to at least a partial refund of the fee paid.

The actual conduct and affairs of PARS' business, particularly at this time, is unclear to this Court, unclear to the Petitioning Creditors, and perhaps unclear to everyone but Mr. Toler himself. The reason for this uncertainty, however, is easily explained—until some time in October 1991, PARS evidently maintained minimal books and records and produced no financial statements. When financial statements were subsequently prepared in connection with the acquisition of a bank loan, there is substantial evidence that the state-

ments were fabricated from whole cloth and contained important misstatements and/or outright falsifications.[5] As a result, Petitioning Creditors and this Court are relegated to analyzing the finances and operations of PARS, pre-petition and post-petition, by way of copies of incomplete check records, check registers, and credit card statements obtained by the Creditors, albeit begrudgingly, from PARS and/or Mr. Toler following the initial hearing on May 12, 1992.

PARS is not currently an operating business. It is either "winding down" or already "wound down." Mr. Toler has created two new entities, PRS, Inc.[6] and TDT Financial Services, Inc. ("TDT"),[7] each operated solely by him and owned by himself and various members of his family. The evidence shows that TDT had neither income nor assets prior to April 27, 1992, when the liquid assets of PARS were rather unceremoniously transferred to TDT.

Mr. Toler, acting as President of PARS, negotiated a purported "agreement" with PRS which, it appears, was primarily for the benefit of PRS. PRS, exclusively controlled by Mr. Toler, is engaged in the same type of telemarketing and accounting services business as was PARS. The "agreement," which was never consummated, finalized or memorialized, requires PARS to pay $20,000.00 per month to PRS and/or TDT, ostensibly as a fee for servicing the remaining PARS contracts and accounts. Clearly, this fugitive "agreement" was not negotiated at arms-length by disinterested parties.[8]

3. PARS did not actually file its Articles of Incorporation with the Colorado Secretary of State until April 30, 1990.

4. Although Mr. Toler now contends that the couple was never "officially" engaged to be married, this Court will use this term to describe the relationship.

5. The testimony presented alleged that cash was overstated by $51,000.00, real estate included as an asset was not actually owned by PARS, there was no contingent liability listed in relation to the contracts with accountants, and the existing liabilities were severely understated.

6. PRS, Inc. filed its Articles of Incorporation with the Colorado Secretary of State on April 30, 1992, two years after similar documents were filed with regard to PARS.

7. The Articles of Incorporation for TDT were filed with the Colorado Secretary of State on August 13, 1990.

8. All events and transfers effectuated by Mr. Toler in late April and early May 1992 (pre-petition), were purportedly undertaken ancillary to another purported "agreement" between Mr. Toler and Mason Brown. This "agreement" provided that Mr. Brown was to acquire PARS' receivables and, through a complicated and not

Both entities, PRS and TDT, either in tandem or separately, appear to be competing directly with PARS, using the contacts and business opportunities formerly belonging to PARS as well as sales personnel. Those two entities evidently have only one source of initial revenue—the alleged Debtor, PARS', income stream and/or receivables. Certain assets of PARS, notably cash, were continuing to be diverted to PRS, TDT and/or Mr. Toler and his current fiancée, without any actual benefit to PARS or general creditors of PARS. Money was hemorrhaging from PARS directly to PRS and/or TDT—not to PARS' creditors. To the extent that payments had been made to PARS' creditors, there had been no pro rata distribution. Evidence indicates payments were evidently made only to those PARS creditors that Mr. Toler viewed as necessary to the ongoing activities of his new businesses, PRS and TDT.

Although Mr. Toler previously testified that the funds in the TDT account were utilized solely for the benefit of the PARS creditors, the partial check register produced at the second hearing belies that assertion. There are numerous and significant personal expenses set forth in the TDT check register. As only one example, after transferring PARS' funds to TDT, the first check written on the TDT account was check number 101 payable to Mr. Toler and Donna Potere [9] in the amount of $10,000.00 which Mr. Toler openly and voluntarily testified was utilized to open a money market account for their personal benefit. Other recent examples are as follows:

| CHECK NUMBER | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 1033 | 04/30/92 | Doris Toler[10] (no explanation) | $500.00 |
| 1034 | 05/02/92 | Kentucky Fried Chicken (personal) | 58.87 |
| 1036 | 05/04/92 | City of Boulder (no explanation) | 16.77 |
| 1037 | 05/04/92 | Cash (trip to Philadelphia to see fiancée) | 500.00 |
| 1041 | 05/04/92 | Public Service (Toler's home gas bill) | 78.84 |
| 1042 | 05/04/92 | United Bank of Boulder (personal car loan) | 692.89 |
| 1044 | 05/04/92 | U.S. West (Toler's home phone) | 54.29 |
| 1046 | 05/04/92 | Flatiron Athletic Club (personal) | 94.00 |
| 1047 | 05/04/92 | Boulder Phone (unexplained) | 33.00 |
| 1048 | 05/04/92 | Golden Bear (unexplained) | 224.84 |

fully articulated procedure, service the receivables with PRS and/or TDT assistance. Significantly, Mr. Toler and Mr. Brown both testified that this "agreement" was never signed, concluded or consummated; it was not implemented. Mr. Brown accused Mr. Toler of fraud and misrepresentations which killed the deal.

**9.** Ms. Potere is alleged to be Mr. Toler's current fiancée.

**10.** Doris Toler is Mr. Toler's mother.

| CHECK NUMBER | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 1050 | 05/05/92 | Four Star Realty (Toler's house payment) | 1,200.00 |
| 1051 | 05/05/92 | Patti Toler (personal) | 1,000.00 |

The diversion of PARS' corporate funds for personal use has continued for a significant period of time. From January 1991 to February 1992, PARS paid $51,287.00 in mortgage payments for properties owned personally by one or both of its directors. The $51,287.00 figure is net of any rental income that was deposited into the PARS account.

Further, throughout the life of PARS and continuing to the present, corporate funds have been used to pay several credit cards used by Terry Toler, Lisah Brown, and Mason Brown. On the credit card statements turned over to the Petitioning Creditors, there are numerous and sizeable charges that are clearly not charges for business expenses. These credit card bills were routinely paid with PARS' funds without documentation, explanation or allocation between business and personal expenses. The routine nature, amounts, and variety of the personal expenses paid for with PARS' funds is stunning. The alleged Debtor's expense records reveal a pattern of living worthy of "Lifestyles of the Rich and Famous." Many thousands of PARS' dollars were spent on travel,[11] clothing,[12] entertainment,[13] and other luxury items.[14] A sampling of some of the more significant or interesting charges made on credit cards and paid for with PARS' funds is attached hereto as Appendix A.[15]

This Court finds that the evidence presented establishes a pattern of extraordinary financial gymnastics on the part of current management. Few aspects of the recordkeeping and expenditures of PARS appear to have been conducted in accordance with conventional business practices, with standard reporting or accounting procedures, or otherwise clearly spelled out and justified.

Persuasive and important testimony was given by the alleged Debtor's former accountant/bookkeeper, Irene Gould. She resigned from PARS April 15, 1992, shortly before the Involuntary Petition was filed. Ms. Gould testified that:

(1) Mr. Toler instructed her to file false miscellaneous income forms (1099's) with the IRS;

(2) many of PARS' checks were made payable to cash for use by Mr. Toler;

(3) despite Ms. Gould's repeated requests, she could not get documentation from Mr. Toler to justify Mr. Toler's many questionable "business" expenses;

(4) PARS' accounts payable were substantially inaccurate and understated;

(5) Ms. Gould was unable to stem Mr. Toler's spending while PARS' creditors were left unpaid, underpaid, and/or purposely deceived by PARS

---

11. This Court notes expenses for destinations such as Grand Cayman, Las Vegas, Singapore, Beverly Hills, Los Angeles, San Francisco, Seattle, Palm Springs, Dallas, Houston, Fort Lauderdale, Tampa, Miami, and Hilton Head, South Carolina. Numerous charges were also incurred for lodging in and around the Boulder area where Mr. Toler lives and works.

12. Clothing with a dubious connection to PARS' accounting business (e.g., Frederick's of Hollywood, Victoria's Secret, Nordstrom, etc.).

13. Country clubs, golf fees, dinner theater, scuba, whitewater rafting, baseball tickets, etc.

14. Art work, jewelry, tapestry, records and compact discs.

15. The sampling *excludes* charges for airfare, lodging, meals, gasoline and GTE airphone charges which could, arguably, be legitimate business expenses although, again, no documentation exists to verify the true nature of these expenses and Mr. Toler did not give testimony to that effect.

as to when or how they would be paid; and

(6) PARS' financial statement was substantially false and misleading.

Ms. Gould further testified that PARS was not paying its debts as they became due. She quit, ultimately, because of the highly irregular, self-serving, deceptive manner in which Mr. Toler was handling the financial affairs of PARS.

Finally, this Court finds that Mr. Toler had a conflict of interest of the first order. PARS, the alleged Debtor, as well as Mr. Toler, the chief officer, director and controlling person of PARS, have a fiduciary duty to the creditors and the Court. This Court finds that, as opposed to fulfilling his fiduciary duties, Mr. Toler has been engaged in a substantially similar and competing business through PRS and TDT; that he diverted the cash and business opportunities of PARS for the benefit of PRS, TDT, himself, and his family. This Court finds that Mr. Toler's management was intended to jump-start and substantially benefit his other, competing start-up businesses, PRS and TDT, while PARS and its general creditors were effectively abandoned and subject to increasing jeopardy. This Court finds that in Mr. Toler's hands the PARS assets in this case are subject to the continuing risk of dissipation, and diversion to PRS, TDT, and/or Mr. Toler and his family.

### B. LEGAL ANALYSIS.

■ The Court concludes that the totality of the evidence favors the Petitioning Creditors' position for the appointment of a trustee on an emergency basis. There is cause for appointment of a trustee; there has been "dishonesty ... or gross mismanagement of the affairs of the debtor by current management...." 11 U.S.C. § 1104(a)(1). The Court further concludes that there could be serious and irreparable injury without the forthwith appointment of an independent, disinterested, competent trustee.

■ As a preliminary, or threshold, matter in analyzing the Renewed Motion, this Court finds that there is a reasonable likelihood, or probability, that this Debtor will eventually be found to be a proper involuntary debtor under 11 U.S.C. § 303 and that an order for relief will enter. In the absence of such finding, this Court believes that the appointment of a trustee during the gap period would be more tenuous, probably improper, and likely an abuse of discretion. In making this preliminary finding, the Court notes that a final determination of the Involuntary Petition is not being made here; the issue is still before the Court. Nonetheless, for purposes of analyzing the Renewed Motion, this Court finds that there is a reasonable likelihood that this Debtor will be found to be not paying its debts as they generally become due and that PARS is a proper candidate for the filing of an involuntary petition under Section 303 of the Bankruptcy Code.[16]

This Court finds that the appointment of a trustee during the gap period—before an order for relief is entered—is authorized and proper under 11 U.S.C. §§ 1104(a)(1)[17], 105 and, by analogy, 303(g).

Section 1104(a)(1) provides as follows:

---

**16.** In making this determination, this Court is cognizant that the Debtor asserts that the Petitioning Creditors' claims are contested, unliquidated and, therefore, that these Creditors may not be proper petitioning creditors. However, in analyzing the Renewed Motion, this Court considered the available evidence on this question presented before it.

**17.** Under these circumstances, appointment of a trustee under Section 1104(a)(2) is inappropriate. That subsection is written in conjunctive and thus requires a finding that the appointment is in the interests of creditors, any equity security holders, *and* other interests of the estate. *Even if* this Court is firmly convinced that the appointment of a trustee is in the best interest of the creditors and other interests of the Estate, it is impossible to find that the appointment of a trustee is in the best interest of *any* equity security holders since it appears that Mr. Toler and Ms. Brown are the only equity security holders in PARS. Since Mr. Toler is opposed to the appointment of a trustee and Ms. Brown has not been heard from, it is impossible under these circumstances to appoint a trustee pursuant to 11 U.S.C. § 1104(a)(2). *Accord, In re St. Louis Globe–Democrat, Inc.*, 63 B.R. 131, 138 n. 9 (Bankr.E.D.Missouri 1985); 2 Collier on Bankr., ¶ 1104.02(4) (15th ed. 1984).

(a) **At any time after the commencement of the case** but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court **shall** order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor....

11 U.S.C. § 1104(a)(1) (emphasis added).

In this case there has been the commencement of an involuntary case by the filing of the Involuntary Petition. Section 1104(a), by its terms, does *not* require the entry of an order for relief prior to appointment of a trustee. Indeed, the plain language of subsection 1104(a) specifically allows for appointment of a trustee in the gap period. The section provides for a trustee's appointment "[a]t any time after commencement of the case ..." (emphasis added).

If Congress had intended to preclude the ability of a court to appoint a Chapter 11 trustee under 11 U.S.C. § 1104 during the gap period, between the filing of an involuntary petition and the entry of the order for relief, then Congress easily could have provided for it. Congress did not. Consequently, this Court finds that it has the statutory authority to appoint a trustee during the gap period.

■ This Court further believes that, if necessary, the exercise of its equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period. Extraordinary circumstances allow for such special authority. *See, In re Unioil,* 948 F.2d 678, 682 (10th Cir.1991).

Section ... 105 of the Code gives the bankruptcy court broad powers to regulate the administration of the cases before it.

*In re Schueller,* 126 B.R. 354, 359 (D.Colo.1991).

This Court is aware of the holding in *Matter of Beaucrest Realty Associates,* 4 B.R. 164 (Bankr.E.D.N.Y.1980) but does not find its reasoning persuasive. Particularly, in light of the evidence presented in this case, this Court finds that an application of the rationale of *Beaucrest* to this case would be inappropriate and potentially disastrous.

*Beaucrest* has neither been cited nor followed by subsequent published opinions. Colliers expressly disagrees with *Beaucrest.*

The appointment [of a trustee] may be made during the period prior to the entry of the order for relief. This is contrary to the apparent holding in [*Beaucrest*].

2 Collier on Bankr., ¶ 303.35 at 303–125– 303–126 (15th ed. 1984).

Although no other reported cases directly address the issue, at least some courts have given tacit approval to the concept of the appointment of a trustee during the gap period. In *In re Colony Press, Inc.,* 83 B.R. 862 (Bankr.D.Mass.1988), three creditors filed an involuntary Chapter 11 petition against the debtor on September 25, 1987 and

promptly filed a motion for the appointment of a trustee, which the Court heard on September 28, 1987. By written order, the Court on that date authorized the appointment of an interim trustee on or after September 30th.

*Id.,* at 863.

Similarly, in *In re St. Louis Globe–Democrat, Inc.,* 63 B.R. 131 (Bankr.E.D.Missouri 1985), the court denied a request for the appointment of a trustee during the gap period because "the petitioning creditors failed to carry their burden of proof to justify, *at this time,* the appointment of a trustee pursuant to 11 U.S.C. § 1104." *Id.,* at 132 (emphasis in original). After the

entry of the order for relief, the *Globe–Democrat* petitioning creditors filed a motion to reconsider the court's denial of their gap period motion. The court subsequently granted the request for an order appointing an operating trustee. *Id.*, at 139.

While the trustee appointed hereby is *not* an interim trustee under Section 303(g), that section is instructive. "At any time after the commencement of an involuntary case under Chapter 7 of this title but before an order for relief ... the court ... may appoint an interim trustee under Section 701 of this title." 11 U.S.C. § 303(g). This Court infers that Congress intended a similar result under the provisions of Section 1104(a)(1) absent a specific limitation to cases commenced under Chapter 7 of the Bankruptcy Code either by the express terms of Section 303(g) or by the placement of Section 303(g) in an article applicable to Chapter 11 and not with those sections peculiar to Chapter 7 alone. *Contra, Beaucrest, supra* at 165.

## II. CONCLUSION.

For the reasons set forth, this Court shall order the immediate appointment of a trustee to take possession of the premises, the books and records, the accounts, and all assets and operations of PARS. Under the circumstances, this Court is perhaps required by the terms of the Bankruptcy Code and the intent of its provisions, to appoint a trustee during the gap period of this involuntary Chapter 11 case.

The Court directs Mr. Toler to cooperate with the trustee.

## III. ORDER.

IT IS THEREFORE ORDERED as follows:

1. The Renewed Motion for Appointment of a Trustee is GRANTED.

2. The Office of the U.S. Trustee shall immediately appoint a trustee to take possession of the premises, the books and records, the accounts, and all aspects of PARS.

3. A trustee shall be appointed as of 5:45 p.m. on May 26, 1992 and shall be authorized to immediately enter onto the premises and take possession and control of the assets and books and records of PARS.

4. Neither assets nor the books and records of PARS shall be destroyed, adjusted, utilized, or removed from the premises by current management.

5. No check shall be written on a PARS account by current management.

6. The status quo of PARS shall be maintained as of 5:45 p.m. on May 26, 1992, until a trustee is appointed and takes possession and control of all PARS' assets.

## APPENDIX A

The notably incomplete credit card statements reveal the following charges:

a. Travel/Recreation:

| | |
|---|---|
| $147.00 | Cruise from Seaescape LTD. Miami (03/03/91); |
| $164.00 | Cruise/tour package from Discovery Tours, Ft. Lauderdale (04/01/91); |
| $ 67.00 | Charged at Cruise Net Inc., Wash. D.C.; |
| $ 13.46 | Charged at Sun Scuba, Orlando; |
| $ 89.69 | Charged at Colo. Whitewater Exp., Poncha Springs, Colo. (07/26/91); |
| $ 12.00 | Charged at Adrenalin Adventures, Louisville, Colo. (07/27/91); |
| $ 85.00 | Charged at Colo. Whitewater Exp., Poncha Springs, Colo. (08/07/91); |
| $ 95.34 | Charged at Oasis Grand Cayman; |
| $ 21.75 | Charged at Cayman Turtle Farm, Grand Cayman, CI (09/01/91); |
| $200.00 | Charged at Treasure Chest, Cayman Brac, CI (09/04/91); |
| $705.08 | Charged at Divi Tiari Beach Resort, Cayman Brac, CI (09/06/91); |
| $120.00 | Charged at Kirk Freeport Plaza Ltd., George Town, CI (09/07/91); |
| $ 26.50 | Dining/entertainment from Hornblower Yachts, San Francisco (09/26/91); and |

$614.16 Charged at Carlton Hotel, Singapore (02/92).

b. Clothing/Accessories*

 $ 55.00 Charged at Victoria's Secret, Eugene, OR (12/26/90);
 $ 75.22 Charged at Broadway Southwest, Westminster, CO (01/01/91);
 $168.34 Charged at The Bugle, Ltd., Boulder, CO (01/28/91);
 $ 20.38 Charged at Victoria's Secret, Lewisville, TX (02/22/91);
 $228.98 Charged at Orly Fashion, Los Angeles (03/02/91);
 $156.61 Charged at Lerner, Boulder, CO (03/16/91);
 $114.02 Charged at Fashion Bar, Boulder, CO (03/16/91);
 $113.78 Charged at Fashion Bar, Boulder, CO (05/15/91);
 $417.30 Charged at Orly Fashion, Los Angeles (05/25/91);
 $ 79.78 Charged at Fashion Bar, Boulder, CO (05/29/91);
 $128.90 Charged from Victoria's Secret Catalog (06/07/91);
 $380.64 Charged at Fashion Bar, Boulder, CO (08/13/91);
 $ 87.46 Charged at Limited Stores, Boulder, CO (08/29/91);
 $118.30 Charged at Limited Stores, Westminster, CO (08/31/91);
 $ 90.26 Charged at Wanamakers, King of Prussia, PA (10/09/91);
 $ 38.40 Charged at Victoria's Secret, Kirkland, WA (10/14/91);
 $164.78 Charged at Clothestime, Sacramento, CA (10/20/91);
 $220.67 Charged at Nordstrom, Sacramento, CA (10/21/91);
 $ 84.03 Charged from Victoria's Secret Catalog (11/01/91);
 $ 81.83 Charged from Victoria's Secret Catalog (11/09/91);
 $351.00 Charged at Nordstrom, Lynnwood, WA (11/11/91);
 $100.25 Charged at Fashion Bar, Lynnwood, WA (11/12/91);
 $ 12.99 Charged at Frederick's of Hollywood, Lynnwood, WA (11/22/91);
 $169.83 Charged at The Gap, Westminster, CO (01/05/92);
 $338.45 Charged at Design Appeal, Palm Springs (01/13/92);
 $323.67 Charged at Cashmere Cashmere, New York City (02/03/92);
 $216.50 Charged at K & F, Los Angeles (02/08/92); and
 $104.97 Charged at K & F, Los Angeles (03/21/92).

* These examples are only the most significant and are, by no means, a complete list.

c. Electronics/Toys.

 $555.42 Charged at Listen Up, Boulder, CO;
 $492.00 Charged at MacWarehouse, S. Norwalk, CT (01/16/92);
 $295.53 Charged at Kay Bee Toy 'N Hobby, Boulder, CO;
 $357.98 Charged at The Sharper Image, Denver (04/09/91); and
 $194.82 Charged at Circuit City, Los Angeles (03/24/92).

d. Miscellaneous.

1. Boulder Dinner Theatre—cumulatively $346.30;
2. Florists—cumulatively $221.19;
3. Artwork—cumulatively $343.57;
4. Books—cumulatively $310.38;
5. Building Supplies—cumulatively $533.13;
6. Golf/Country Club/Sports Equipment—cumulatively $296.90;
7. Target Stores—cumulatively $3,185.78;
8. Dale Carnegie Institute, Denver—$950.00;
9. Jewelers—cumulatively $1,215.58;
10. Medical—cumulatively $466.00;
11. Tapestry from Hanover House, Hanover, PA for $123.91 (04/09/92);
12. Records/CD's—cumulatively $221.07;
13. Continuing Education—$220.00 (01/16/91);
14. Automobile Expenses (excluding rentals)—cumulatively $698.95;
15. Docktor Pet Center, Tampa, FL $137.77 (03/30/91);
16. Texas Rangers Baseball Tickets, Arlington, TX $27.00 (04/14/91); and
17. General Nutrition Center, Boulder, CO $35.70 (11/20/91).