[626 NYS2d 74]

ARNOLD HERSTAND & CO., INC., Respondent-Appellant, v GALLERY: GERTRUDE STEIN, INC., Appellant-Respondent.

First Department, April 27, 1995

**APPEARANCES OF COUNSEL**

*Susan R. Sheppard* of counsel, New York City *(Whitman Breed Abbott & Morgan,* attorneys), for respondent-appellant.

*Richard J. Pilson* of counsel, New York City *(Ethan M. Brodsky* on the brief; *Berliner & Pilson,* attorneys), for appellant-respondent.

## OPINION OF THE COURT

WALLACH, J.

In this action between two art galleries to rescind the sale of a drawing alleged to be spurious, we reverse the summary judgment in favor of plaintiff purchaser (Herstand) which was granted upon the purported ground of mutual mistake of fact. Defendant seller (Stein), before both the motion court and us, has fully rebutted any notion of mistake, mutual or otherwise, and has defended the drawing, "Colette de Profil" (c. 1954), as the genuine work of the renowned European artist, Balthazar Klossowski de Rola (Balthus). The absence of any participation by Stein in the suppositious "mistake" by Herstand as to the genuineness of the work received in the consignment and sale transaction renders the remedy of rescission unavailable as a matter of law *(Brauer v Central Trust Co.,* 77 AD2d 239, *lv denied* 52 NY2d 703; *see also, Ryan v Boucher,* 144 AD2d 144, 145). Furthermore, and wholly apart from this procedural flaw, we hold that Stein has presented a triable issue with respect to the authenticity of the work itself.

Balthus himself has submitted an affidavit sworn to on January 18, 1992, when he was almost 84 years of age.[1] After an assertion that "I am not blind", he relates that "[i]n or around 1990" he met with one Claude Bernard, the operator of a Parisian art gallery, who has since successfully rescinded his purchase of this same "Colette" with Herstand. Bernard showed Balthus a photograph of the drawing which the latter denounced as a fake, writing "faux manifeste" on the back. On two subsequent occasions, in September 1991 and January 1992, Balthus signified in writing his rejections of similar photographs of this work. It should be noted that since this drawing, fake or otherwise, existed in 1954, these repudiations pertain to a work created by someone more than 35 years earlier.

Having read the Balthus affidavit, André Emmerich, president of the Art Dealers Association of America and a prominent art dealer himself, submitted an affidavit on behalf of Herstand in which he opined as "self-evident [that] the artist

---

1. Balthus was born in Paris on February 29, 1908, and now resides in Switzerland.

is the definitive expert on what is his/her own work. When a living artist repudiates a work as a forgery or a fake, the work becomes unmerchantable and unsalable." This view of the nonmarketability of the item was enlarged in the widest possible terms when the motion court granted summary judgment upon the ultimate issue herein, finding that "the artist's signature and declaration that the drawing is not authentic is the final word on the validity of the art work."

Undoubtedly some situations may arise where the artist's own acceptance or rejection of a questioned work will be the "final word." However, this case is not one of them. Enough has been brought forward to give the now-orphaned "Colette" her day in court, with a fair chance to lay claim to full legitimacy.

## Deficiencies in Plaintiff's Proofs

Clearly, the three Balthusian certifications of falsity, offered as they are for the truth of the matter asserted in them, are pure hearsay. The fact that these opinions are in writing gives them no added evidentiary value *(Boschen v Stockwell,* 224 NY 356). Insofar as the motion is concerned, plaintiff's entire case presently rests on this incompetent evidence. Nowhere does plaintiff cite an exception to the hearsay exclusionary rule, nor does plaintiff offer any other basis for their admissibility without a testimonial foundation from Balthus himself, who has never even been deposed, let alone cross-examined. And surprisingly, plaintiff has produced no expert who states that the drawing is a fake, whereas defendant has proffered at least one who asserts that it is genuine. Mr. Emmerich does not impugn the work itself; his role is merely to indicate his views with respect to the market impact of the artist's actions upon the dollar value of the drawing. We might well stop here and conclude that plaintiff has failed to make even a facial showing of entitlement to the drastic relief of summary judgment. But beyond that, defendant's separate evidentiary showing raises triable issues.

## The Provenance of the Drawing

In *Greenberg Gallery v Bauman* (817 F Supp 167, *affd* 36 F3d 127), the issue before the United States District Court for the District of Columbia was the authenticity of a particular mobile sculpture ascribed to the late Alexander Calder. At

that trial in 1993, the same Andre Emmerich testified on the question of genuineness, offering the opinion that the "flawless provenance" of the subject work of art was " 'the best proof of authenticity I can think of.' " (817 F Supp, *supra,* at 173.) Obviously, provenance—i.e., the source and subsequent custodial history of an art work—is a weighty consideration in the process of authentication *(Greenwood v Koven,* 1993 US Dist LEXIS 18272, *3, n 2 [SD NY, Dec. 29, 1993, Haight, J.]; *Peters v Commissioner of Internal Revenue,* 36 Tax Ct Mem Dec [CCH] 552, Tax Ct Mem Dec [P-H] ¶ 770128 [1977]).

If the provenance of the Calder mobile in *Greenberg Gallery* was "flawless," the same test may be approached (and perhaps surpassed) here. It is undisputed that defendant's principal, Gertrude Stein, acquired this drawing in the late 1960's directly from Frederique Tison, who was then married to Balthus. The drawing was purchased with a group of others, the authenticity of which has apparently never been questioned. It remained continuously in Stein's possession until plaintiff took possession of the drawing on consignment in 1988, together with an original certificate of authenticity signed by Ms. Tison in the '60s. Significantly, Herstand's principal, Nancy Herstand, concedes in her affidavit that "Ms. Tison owned a number of works by Balthus and [she] commonly authenticated works created by Balthus." It also appears that in the 1960's the price for a Balthus drawing was quite modest, and it is argued that at that time such a work would be unlikely to attract the skill or interest of a forger. Thus, provenance here points only in the direction of authenticity.

## Contradictory Conduct by Balthus in 1980

Dr. George Szabo, curator of the Robert Lehman Collection and a department head at the Metropolitan Museum of Art, states in his affidavit on behalf of defendant that he has dealt extensively with original Balthus works. In 1980, Dr. Szabo was in charge of preparing a Balthus exhibit in Italy for the singularly prestigious La Biennale di Venezia—a showing at which he describes as "the highest honor that can be bestowed upon a living artist." He prepared a catalogue in April 1980 of the works to be shown at Venice, and distributed copies throughout the world, including to Balthus himself and to his exclusive United States dealer, Pierre Matisse. Included in the catalogue was the drawing at issue here.

Dr. Szabo met with Balthus and Matisse on July 9, 1980, the eve of the opening of the Biennale show. According to Dr. Szabo, Balthus produced a copy of the catalogue and expressed dissatisfaction with Szabo's editorial comments as an invasion of his privacy. Dr. Szabo avers that in the course of the discussion of Balthus' objections to the editorial matter, neither the artist nor Mr. Matisse ever objected to the pictorial content, or even remotely suggested that this drawing or any other work attributed to Balthus in the catalogue was "faux", despite complete familiarity with the catalogue contents. Indeed, Dr. Szabo maintains that the 1980 catalogue has since become a recognized source of authority on Balthus' works.

## A Page (or Two) of History

A fundamentally false assumption would appear to animate both the views of Mr. Emmerich and the motion court: that nothing can be imagined which would induce an artist to repudiate his own genuine work. History tells us otherwise. Two examples from the safe distance of the eighteenth century will illustrate the point.

In May 1777, Dr. William Dodd, an Anglican clergyman, lay confined in London's Newgate prison under sentence of death for the crime of forgery. Dr. Samuel Johnson composed an unsuccessful petition to King George III in Dodd's name for some sort of reprieve. At the same time, Johnson wrote a remarkable sermon for Dodd to preach to his fellow inmates, entitled "The Convict's Address to his unhappy Brethren."[2] Even during Johnson's lifetime, he was widely perceived as having been the author, but he firmly denied it. On one occasion, when badgered by a friend of Dodd's to own up to the truth, Johnson delivered to Mr. Seward and the world the oft-quoted (and -misquoted) memorable disclaimer: "Depend upon it, Sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully."[3] Johnson's reluctance to acknowledge his authorship remains something of a puzzle even to this day.

Then there is the case of Alexander Pope, no stranger to literary shenanigans of all kinds. Pope was capable of anonymous publication of an accusation of plagiarism against his

---

2. *See,* Wain, *Samuel Johnson,* at 343 (Viking Press, New York, 1974); Bate, *Samuel Johnson,* at 524 (Harcourt Brace Jovanovich, New York and London, 1975).

3. Boswell's Life of Johnson, at 368 (Collier Books, New York, 1961).

own works, only to give him the opportunity for a devastating reply. Of Pope's mock-epic poem, *The Dunciad,* Dame Edith Sitwell tells us: "The poem appeared, in an imperfect edition, in May 1728 * * * The enlarged work, on its appearance, was surrounded by a fleet of pirated editions, just as a ship is surrounded by a school of porpoises, bobbing and floundering. Pope enjoyed the intrigues surrounding these editions, and his own mystifications about the authorship and the notes, and a million other matters. He even went so far as to assign over 'the Dunciad, an Heroic Poem' to the Earls of Burlington and Oxford, and Lord Bathurst, and these, in their turn, transferred it 'with the sole right and liberty of printing the same', to Pope's publisher, Lawton Gilliver. 'By this transaction', says Carruthers, 'the poet concealed his name, yet protected his property.' This left the poet free to disclaim anything he chose, claim anything he chose, hit anybody and deny that he had hit them, parry assaults, complain of injuries, protect his good name, and amuse himself in a million ways."[4]

These examples from the lives of Samuel Johnson and Alexander Pope are highly relevant to resolution of the controversy before us today. One can only shudder at the thundering dudgeon with which the shade of the good Doctor would react to a contrary suggestion,[5] as well as pale at the waspish pique of his literary predecessor. True, these eminent representatives of England's Augustan Age can never take the witness stand in the trial that must now take place here. But this does not diminish their relevance in our appellate forum, where they provide eloquent witness to the central issue in the case: can authors, even of great repute, repudiate the work of their own hands? The behavior of Johnson and Pope tells us "yes," for reasons which can run the full range from the ridiculous to the sublime. Further, they stand in weighty support of Oliver Wendell Holmes' great aphorism that "a page of history is worth a volume of logic" *(New York Trust Co. v Eisner,* 256 US 345, 349).

The fundamental error at the core of plaintiff's position is the mistaken notion that it makes no difference whether hearsay evidence is enlisted for or against summary judgment. This misconception was laid to rest years ago in *Phillips v*

---

4. Sitwell, *Alexander Pope,* at 195-196 (W. W. Norton & Co., New York, 1962).

5. For the irascible behavior of the shade of Dr. Johnson, see Bangs, *A Houseboat on the Styx,* at 47-48 (Harper & Bros., New York, 1898).

*Kantor & Co.* (31 NY2d 307, 312), where Judge Breitel offered the following analysis on the role of such supposedly incompetent evidence in opposing summary judgment: "In England, where summary judgment originated, the motion is decided, as in the United States, on affidavits (e.g., *United Founders' Trust Ltd.* v. *Fitzgeorge,* 7 Times L. R. 620 [1891]). To defeat the motion the opposing party need not necessarily 'show a good defence on the merits if he can suggest some reasonable defence.' 'Hearsay evidence is not to be shut out' (50 English and Empire Digest 408; *Harrison* v. *Bottenheim,* 26 W.R. 362, 363 [1878]). An affidavit is not conclusive, for 'it is impossible to tell what facts may be discovered and relied on by the time the trial comes on' *(Ray* v. *Newton,* [1913] 1 K.B. 249, 258)."

Thus, it was held in *Kantor* that evidence which might be excludable on the trial because of the bar of the Dead Man's Statute (CPLR 4519) would be sufficient to *defeat* summary judgment at the pretrial state. But this is a far cry from suggesting that a judgment in a contested civil action may be supported solely upon hearsay. We have held that even a judgment in the trial of a small claims action, under the relaxed rules of evidence there obtaining (CCA 1804), cannot rest upon a totally hearsay foundation. "[W]e would have no hesitancy in saying that a decision which rests wholly on hearsay evidence cannot stand in any court" *(Levins v Bucholtz,* 2 AD2d 351, 351-352).

## Conclusion

Confident of the genuineness of the questioned drawing, Dr. Szabo believes that Balthus is now acting from personal animus against his former wife. He suggests that Balthus has repudiated some of his works in the past "to punish former lovers or dealers with which he has had disagreements." Such a motive will be relevant when the issue is explored at a trial —a trial to which Stein is manifestly entitled. Notably, Balthus' repudiation here neither damaged his pocketbook nor diminished his reputation, since this drawing was merely a preparatory sketch for a subsequent well-known oil painting by the same artist.

Accordingly, the judgment of Supreme Court, New York County (Myriam J. Altman, J.), entered April 22, 1993, which summarily rescinded the consignment contract between the parties, awarded plaintiff the sum of $40,000 plus interest and costs, and dismissed defendant's counterclaim, should be re-

versed, on the law, without costs, and the matter remanded for further proceedings consistent herewith.

ELLERIN, J. P., ROSS, NARDELLI and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, entered April 22, 1993, which summarily rescinded the consignment contract between the parties, awarded plaintiff the sum of $40,000 plus interest and costs, and dismissed defendant's counterclaim, reversed, on the law, without costs, and the matter remanded for further proceedings consistent with this Court's opinion.