**In re Michael N. ALTMAN, Debtor**

**Bankruptcy No. 94–51898.**

United States Bankruptcy Court,
D. Connecticut.

Feb. 1, 1999.

**8**

Douglas E. Spelfogel, Garden City, NY, for Raphael Galleries, Inc. and Benjamin Aryeh.

Mark R. Jacobs, Jacobs Goldman LLC, Merit View, Norwalk, CT, for Michael N. Altman.

## MEMORANDUM AND ORDER

ALAN H. W. SHIFF, Chief Judge.

Creditors Rafael Galleries, Inc. and Benjamin Aryeh (collectively "Rafael") allege that a painting by Richard E. Miller known as "Women at Tea: Giverny" (the "Painting") is property of the debtor's bankruptcy estate. The controversy here arises under the debtor's objection to Rafael's proof of claim and Rafael's motion for the appointment of a chapter 11 trustee. *See* Rule 3007, F.R. Bankr.P.; 11 U.S.C. §§ 502, 1104.

The court first considers whether the Painting is property of the debtor's estate. If so, or if other circumstances warrant, *see* § 1104(a)(1), the court will consider the appointment of a trustee.

## BACKGROUND

As recounted below, the historical ownership of the Painting has been purposely or at least carelessly obscured. Accordingly, the following findings, which detail the various transfers of the Painting, are provided without the benefit of an adequate documentary trail and are largely based on the debtor's testimony. It is noted that the only trial witnesses were the debtor and Dr. Roberta Carroll, one of a series of transferees, both of whom were called by Rafael. The only documentary evidence was offered by Rafael. Further, as stated *infra* at 12–13, the debtor's candor has been discredited. Accordingly all references to the transfers of the Painting with the exception of the transfer to Dr. Roberta Carroll, *see infra* at 9–10, should be read to mean alleged transfers. *See Bose Corporation v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it"); *United States v. Garcia–Duarte*, 718 F.2d 42, 48 (2nd Cir. 1983) (Where the credibility of a witness is challenged, the finder of fact is "entitled to reject his testimony, in whole or in part. . . .").

Within a seven year period, the Painting or an interest in it was transferred at least eight times to, from, or by the debtor and/or corporations in which he had an interest.[1] The first transfer occurred in June 1988, when the debtor and his company Altman Fine Arts, Inc. ("AFA") acquired the Painting on behalf of AFA and Rafael from Hollis Taggart Galleries for $200,000. Of that amount, $50,000 was provided by Rafael as a down payment. Although Rafael had proposed that both it and AFA contribute $100,000 to become joint owners, when Rafael provided no further money, AFA supplied the remaining $150,000, asserted title to the Painting, and took possession. The precise date on which AFA asserted title is unclear. *Tr. 1* at 21–23; *Tr. 2* at 79, 123.[2]

The second transfer was on July 28, 1988, when Cambridge Factors, Inc. ("Cambridge"), a financing company, loaned $800,000 to AFA and was granted a security

---

1. The bankruptcy code defines "transfer" as
    . . . every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title

    as a security interest and foreclosure of the debtor's equity of redemption.
    11 U.S.C. § 101(54) (West 1997).

2. *Tr. 1* and *Tr. 2* reference the two trial days.

interest in all of AFA's inventory, including the Painting ("Cambridge note"). *Tr. 2* at 83. The financing statement did not disclose any interest of Rafael. *See Exh. N.* The debtor testified that AFA's normal course of business terminated approximately in November 1988 when Altman/Burke Fine Arts, Inc., ("ABFA") began its operations. *Tr. 2* at 122. *See also Tr. July 29, 1997* at 12. AFA owned the Painting until March 1989. *Tr. July 29, 1997* at 18. AFA filed its last tax return in 1991. *Tr. July 29, 1997* at 12, 18. ABFA was created and co-owned by the debtor[3] and took over AFA's lease as well as the responsibility for liquidating its inventory. *Tr. 2* at 121.

The third transfer occurred in March 1989, when ABFA sold the Painting to Howard Kiviat in exchange for another painting.[4] The name, artist, and value of the exchanged painting have not been disclosed. *See Tr. July 29, 1997* at 32, 43. Rafael received no consideration from the sale. The parties dispute whether the sale was intended to avoid Cambridge's security interest in the Painting, *Tr. 2* at 120, but it is apparent that it had that effect.

The fourth transfer occurred on an undisclosed date in the spring of 1990, when ABFA reacquired the Painting from Kiviat in exchange for three paintings worth approximately $115,000. *See Tr. 2* at 82, 86, 112–13.

The fifth transfer occurred on an unspecified date subsequent to the Cambridge loan, when, under a "revolving loan account," ABFA purported to give Sotheby's a security interest in its inventory, including the Painting. *See Tr. July 29, 1997* at 64. Notwithstanding the debtor's claim that ABFA began winding up its business in April 1991,[5] it did not cease day to day operations until the end of 1992, and it did not file its last tax return until 1993. In the meantime, on October 22, 1991, the debtor, Cambridge, AFA, and ABFA entered into a settlement agreement which, with the exception of the Painting in which Cambridge retained its security interest, gave Cambridge all of AFA's inventory, in full satisfaction of the Cambridge note. *See Tr. 2* at 119 and *Tr. July 29, 1997* at 47, 62–63. *See also Exh. O.* The settlement also released the debtor from any personal liability on that note.

The sixth transfer occurred on November 25, 1991, when ABFA sold the Painting "free and clear of any liens or encumbrances," notwithstanding Cambridge's security interest,[6] for $140,000 to an investment company owned by the debtor's mother, Carole Altman.[7] *Exh. J.; Tr. 1* at 139, 144; *Tr. July*

---

**3.** ABFA operated at the same New York City address as AFA. The transfer of the inventory to ABFA is not considered a transfer as defined by Code § 101(54) because those entities are the alter ego of the debtor. *See infra* text at 13–14.

**4.** The debtor's attorney asserted "there is no prohibition in the Cambridge note which says, 'you can't sell your inventory in the ordinary course, even if you are liquidat[ing].'" *Tr. Aug. 26, 1998* at 40. The parties dispute whether this was a transfer within in the ordinary course under the Cambridge note. *See* discussion *infra* text at 13–14.

**5.** The debtor testified that notwithstanding the winding up of ABFA, his mother loaned ABFA $250,000 in 1991 because ABFA needed an influx of cash. To repay the loan, ABFA allegedly established a special account from which it periodically purchased paintings for Carole Altman. No documentation regarding the loan document or those purchases is in evidence, and the precise date of the loan is unclear. *Tr. 2* at 89; *Tr. July 29, 1997* at 23.

**6.** In or about 1992, Cambridge filed a bankruptcy petition in the Southern District of New York.

The trustee for Cambridge's estate commenced an adversary proceeding against AFA, Michael Altman, and Neil Morris, who cosigned the Cambridge note. *Tr. 1* at 37–39. The settlement agreement's release of personal liability, *see Exh. O*, was effectively nullified by a judgment in favor of the Cambridge estate which entered against AFA and Michael Altman on August 19, 1994, for $1,000,000 plus interest. That judgment, which apparently stemmed from, *inter alia*, his failure to appear to be deposed, *Tr. 1* at 39, prompted Altman to file the instant bankruptcy case. *Tr. 1* at 39.

**7.** The bill of sale to Carole & Company does not bear Carole Altman's signature. *See Exh. J; Tr. July 29, 1997* at 68–70. Litigation involving the Painting between Rafael and the debtor was pending in New York state court at the time. *Tr. 1* at 23–24; *Tr. 2* at 105, 124. Of the purchase price, Carole Altman paid $75,000 directly to Sotheby's, which released liens held by Sotheby's against ABFA's inventory, including the Painting. *Tr. 2* at 90. The remaining $65,000 was deducted from Carole Altman's special account. *See supra* n. 5. The balance of the special account was used to purchase other paintings for her.

*29, 1997* at 48. In September 1993, the debtor formed a new company, Michael N. Altman & Company ("MNA&C"), which was given a verbal right to consign the Painting on behalf of Carole Altman. Between November 1991 and the date of the seventh transfer, possession of the Painting alternated between Carole Altman, ABFA, and MNA&C.

The seventh transfer occurred on September 29,1994, the date that the debtor filed the chapter 11 petition which commenced this case.[8] On that date, MNA & C and the debtor, who was allegedly acting in his capacity as the agent for Carole Altman, sold the Painting to Joseph P. Carroll, a dealer who specialized in Korean art, for the benefit of his wife, Dr. Roberta Carroll, in exchange for $20,000 cash,[9] four paintings, and an exclusive option to reconsign the Painting. *See Exh. A; Tr. 2* at 68–71. That exclusive option authorized MNA & C to continue to consign the Painting for up to 18 months over a three year period and to collect any sale amount in excess of $225,000 for selling the Painting.[10] *Id.* The option was exercised by the end of October, 1994. *Tr. July 29, 1997* at 80.

The eighth transfer occurred in November 1995, when MNA & C transferred the Painting to Berry Hill Galleries at Joseph Carroll's instruction.[11] MNA & C executed a

November 17, 1995 letter, signed by the debtor and addressed to Joseph Carroll, which asserted that the transfer to Berry Hill was free and clear of any liens and encumbrances, including Cambridge's security interest, but did not disclose the identity of the Painting's owner. *See Exh. I.* The Painting remains at Berry Hill under this court's restraining order which prohibits any further transfer, conveyance, or encumbrance.

Rafael filed a proof of claim on February 1, 1995 in the amount of $300,000, asserting a security interest in the Painting for "money loaned." *See* Rule 3003, F.R. Bankr.P.; Claim # 19. The debtor filed an objection on October 30, 1995, contending that the claim failed to provide evidence of a perfected security interest, as required by Rule 3001(d), and that it was otherwise without factual support. *See* Rule 3007, F.R. Bankr.P. and 11 U.S.C. § 502. On February 6, 1996, Rafael filed the instant motion to appoint a trustee under 11 U.S.C. § 1104, asserting that the debtor had, *inter alia,* engaged in the "concealment of assets, deception and outright dishonesty." *Motion to Appoint* at 3.

## DISCUSSION

### *Property of the Estate*

■ The bankruptcy estate is comprised of "all legal or equitable interests of the

---

8. *See supra* n. 6.

9. Of the $20,000, *see Exh. M,* Carole Altman was initially paid $10,000, and it appears that that was all she was ever paid, *see Tr. 1* at 68,70, 74–75, notwithstanding the debtor's testimony that "in the end I believe she got more than the $20,000." *Tr. 1* at 67. The debtor's testimony that the $10,000 was consideration for the sale conflicts with MNA&C's bookkeeping records which characterize that amount as a loan and the debtor's description of the funds he generally provided to Carole Altman. *See Tr. 1* at 76 and *Tr. 2* at 139. The debtor testified that the loans were in fact "advances against future sales" for which he collected no interest. *Tr. 1* at 77, 79. It is noted that MNA&C collected no sales tax in connection with the exchange transaction.

10. Dr. Carroll testified that her husband was a sophisticated dealer in the art world and was careful to keep records and documents of the ownership of their art collection, including consignment agreements. *See Tr. 2* at 47–48. According to the debtor, Joseph Carroll asked him to provide a provenance, a document often used

in art authentication that establishes the source and custodial history of art work, *see Arnold Herstand & Co., Inc. v. Gallery: Gertrude Stein, Inc.,* 211 A.D.2d 77, 80, 626 N.Y.S.2d 74, 76 (1995), for the Painting, which the debtor claims he subsequently provided via facsimile. *Tr. 2* at 35, 97; *Tr. July 29, 1997* at 63. That document was not offered in evidence.

MNA&C did not transfer possession of the four exchanged paintings to Carole Altman, notwithstanding her purchase. Further, although there was no written evidence or testimony which disclosed any authorization from Carole Altman that MNA&C had the right to consign the four paintings, MNA&C nonetheless offered them for sale. *Tr. 1* at 82–84. This is supportive evidence of fraud. *See infra* at 15–16.

11. The debtor testified that he "might have helped facilitate [the consignment deal to Berry Hill Galleries] in some way," *Tr. 2* at 21, that he "probably had the [P]ainting sent over to Berry Hill," *id.,* and that the Painting was with MNA&C for the majority of the 14 months before its consignment to Berry Hill. *Tr. 2* at 67.

debtor in property as of the commencement of the case," wherever located and by whomever held. 11 U.S.C. § 541(a)(1). The statutory definition of estate property is broadly construed. *See, e.g., United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *In re Prudential Lines, Inc.* 119 B.R. 430, 432 (S.D.N.Y. 1990), *aff'd,* 928 F.2d 565 (2d Cir.1991), *cert. denied,* 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991). The burden of proof as to what is property of the estate generally rests with the creditor. *In re Altchek,* 124 B.R. 944, 955–56 (Bankr.S.D.N.Y.1991). The law of the state in which the property is located determines whether and to what extent the debtor has an interest in the property. *See Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (citations omitted) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law"); *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law"); *Lind v. O'Connell (In re Lind),* 223 B.R. 64, 67 (Bankr.D.Conn.1998). At all relevant times, the Painting has been located in New York state, and the parties agree that New York law controls. Rafael contends that under applicable New York law, the debtor and his various corporations are alter egos so that the property allegedly owned by those corporations are in fact property of the debtor's estate.

## Alter Ego

■ The separate identity of a corporation and one or more of its related entities will not be respected when the corporate form is used to mislead creditors or potential creditors. The corporate veil of that corporation may be pierced under those circumstances. *See* PHILLIP I. BLUMBERG, THE LAW OF CORPORATE GROUPS, § 14.02 at 516 (1985). New York follows that principle and provides further that a corporate veil may be pierced if the corporation is used for the benefit of those who control it rather than for corporate business. *See Morris v. New York State Department of Taxation and Finance,* 82 N.Y.2d 135, 140, 141, 603 N.Y.S.2d 807, 623

N.E.2d 1157 (N.Y.1993). The party seeking to pierce the corporate veil:

> must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene ... The direction of the piercing is immaterial where the general rule has been met.

*State v. Easton,* 169 Misc.2d 282, 647 N.Y.S.2d 904, 908–909 (1995), *citing Morris, supra,* 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157. *See also In re Carterhouse,* 94 B.R. 271, 276 (Bankr.D.Conn.1988) (a corporate veil will be pierced "in a situation in which the corporate entity has been so controlled and dominated that justice requires liability be imposed on the real actor"; applying Connecticut law on piercing the corporate veil which is substantively identical to the law of New York).

■ The question then is whether New York would find that the debtor's individual identity should be equated with that of his various corporate identities. For the reasons that follow, it is concluded that the separate existence of the debtor's corporations would not be recognized under New York law because the debtor controlled each corporate entity and he used the corporate form to perpetrate a wrong or injustice against Rafael.

*AFA:* The debtor created, was the sole shareholder of, and controlled AFA. *See Tr. 2* at 78. The debtor's testimony disclosed that despite Rafael's $50,000 investment, he represented that AFA was the sole owner of the Painting. Indeed, just one month after Rafael's investment, the debtor, through AFA, used it as collateral for the Cambridge loan without disclosing Rafael's interest. Accordingly, the piercing of AFA's corporate veil is warranted.

*ABFA:* The debtor created and was initially the sole owner of ABFA, but testified that he conveyed a 50% ownership interest in the company to Russell Burke for no consideration. The conveyance was verbal so as to conceal that interest from Burke's wife. The debtor claims that he was in charge of day to day operations and that Burke made the

decision on the purchase and sale of inventory. Apart from the debtor's testimony, there is no other evidence through testimony, company records, correspondence, or otherwise to support the debtor's claims.

The debtor, through ABFA, directly participated in three transfers of the Painting, *see Tr. 2* at 87–88 and 90, each of which ignored Rafael's interest. The debtor's argument that the transfers back and forth to Kiviat eliminated Cambridge's security interest is unpersuasive. The Cambridge note provided, *inter alia*, that AFA:

> shall not, without prior written consent of [Cambridge Factors], enter into any transaction of merger, sale or consolidation or transfer, sell, assign, lease or otherwise dispose of (*other than the sale of finished products in the ordinary course of business* ) any of its assets, any of its stock, *or wind up, liquidate or dissolve its business.* See Exh. O, "Note" at 5 (emphasis added).

It is clear from the Cambridge settlement agreement that AFA's inventory, later acquired by ABFA, could not be sold except in the ordinary course of business. Notwithstanding the debtor's contrary conclusion, *see Tr. 2* at 143, the sale of the Painting during ABFA's liquidation was not in the ordinary course of business. *Lopa v. Selgar Realty Corp., (In re Selgar Realty Corp.),* 85 B.R. 235, 240 (Bankr.E.D.N.Y.1988) (interpreting ordinary course under § 363(c)(1))("The sale of a substantial part of . . . inventory is not in the ordinary course of business since it is not in the ordinary course to engage in one's own liquidation."). Indeed, the debtor concedes that the transfer occurred after AFA ceased its "normal course of business." *Tr. 2* at 122. Moreover, because Cambridge's security interest survived the transfer to Kiviat, *see* N.Y.McKinney's Uniform Commercial Code § 9–306, it is irrelevant whether that transfer is characterized as "bona fide." *See Tr. Aug. 26, 1998* at 45.

Even assuming *arguendo* that the transfers of the Painting back and forth to Kiviat somehow eliminated Cambridge's security interest, those transfers were fraudulent as to

Rafael in that they effectuated a transfer without recognizing Rafael's interest. Undoubtedly, the debtor was aware of Rafael's asserted interest in the Painting in that it was the subject of pending New York state court litigation.[12] *Tr. 2* at 101–107. The Painting was also transferred by the debtor, through ABFA, to Carole Altman again without recognizing Rafael's interest. In fact, the debtor/AFBA attempted to transfer it "free and clear of any liens and encumbrances" one month after the debtor signed the Cambridge settlement agreement which had explicitly *reasserted* Cambridge's lien against the Painting. In addition, according to the debtor, the transfer to Carole Altman was intended to keep the business going, notwithstanding his testimony that ABFA had begun to wind up its business some eight months earlier. The cumulative effect of this evidence warrants the conclusion that ABFA's creditors including Rafael were injured by the debtor's misuse of ABFA's corporate form. Accordingly, piercing *its* corporate veil is warranted.

*MNA&C:* The debtor has been the sole shareholder of MNA&C since he formed that company in September, 1993. There is some discrepancy as to whether the money paid by MNA&C to Carole Altman should be characterized as credits, as the debtor testified, or as loans, as his business records reflect. That conflicting evidence was not adequately explained by the debtor. *See, e.g., Tr. 2* at 8 and *supra,* n. 9.

MNA&C acquired a consignment interest in the Painting from Carole Altman, retained the Painting on its premises for a substantial period of time, and then transferred it to Dr. Roberta Carroll on the date of the debtor's bankruptcy petition. There was no disclosure of Carole Altman's identity, the debtor's pending or imminent bankruptcy, *Tr. 2* at 109, or Rafael's interest in the Painting. Nor did Rafael receive any consideration from the sale. After Dr. Carroll returned the Painting to the debtor/MNA&C for consignment, his/its exclusive right to consign the Painting was waived.[13] Finally, the debt-

---

12. This fact supports the finding of a fraudulent transfer. *See infra* text at 15–16.

13. A possible explanation is that it was not a waiver at all, i.e., the debtor believed he would

or testified that his business address also functioned as a personal residence, *Tr. 2* at 19, and that MNA&C, with his approval, had provided him with a personal loan of $99,-993.41. It is apparent that the loan has not been repaid. *See Tr. 2* at 7–12. As noted, use of the corporate form for personal benefit is an indication of an abuse of the corporate form. *Morris, supra,* 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157. Cumulatively, the evidence warrants the conclusion that the debtor's use of MNA&C's corporate form caused an injury to its creditors, including Rafael.

■ Apart from the above analysis, there is no persuasive evidence that the debtor sold the Painting to Carole Altman. Indeed, the only evidence offered by him on that subject was his testimony on cross examination. Having observed several instances of the debtor's inconsistent testimony, and his demeanor on the witness stand, which was transparent and calculating, and noting that he either failed to keep or declined to produce adequate documentation of the sale to Carole Altman, such as inventory and cash flow records from ABFA,[14] the court finds the debtor's testimony to be untrustworthy, and that there was no sale to Carole Altman. Accordingly, she could not and did not consign the Painting to the debtor, and he could not sell it to Dr. Carroll. However, even assuming *arguendo* that Carole Altman purchased the Painting and then consigned it to the debtor, it would still be subject to the claims of his creditors under New York consignment law, as discussed below.

### Consignment

The December 27, 1996 pretrial order stated that Rafael had the burden of proving that the Painting is property of this bankruptcy estate. The court clarified on the record that "[e]ven if there is a burden of proof in one direction, at some point, it changes." *See Tr. July 29, 1997* at 2. In the instance of consigned property, the general rule is modified to impose the burden of proof upon the party asserting the applicability of § 541(b) for the reason that it was consigned. *See Altura Partnership v. Breninc, Inc., (In re B.I. Financial Services Group, Inc.)* 854 F.2d 351, 354 (9th Cir.1988) ("When property of the estate is alleged to be held in trust, the [proponent of that argument] has the burden of establishing the original trust relationship."); *Taxel v. Vaca (In re San Diego Realty Exchange, Inc.),* 132 B.R. 424, 428 (Bankr.S.D.Ca.1991) (same). *See also, Loeb v. G.A. Gertmenian & Sons (In re A.J. Nichols, Ltd.),* 21 B.R. 612, 615 (Bankr.N.D.Ga.1982).

■ Typically it is a creditor/consignor who contends that property should not be included in a consignee's bankruptcy estate, because that consignor seeks to retain its interest in the consigned property for itself or its creditors. Here, the debtor seeks to exclude the Painting, and therefore has the burden of proving that claim.

New York has adopted the Uniform Commercial Code, which governs consignments.

The term 'consignment' is not defined in the [Uniform Commercial] Code, but ... refers to a transaction wherein goods are delivered to a dealer for sale with the understanding that the dealer shall either sell the goods for the person making delivery and remit to him the price, or if he

---

14. Although a bill of sale to Carole & Company was introduced into evidence by Rafael, *see Exh. J,* it bears a blank signature line for Carole Altman. The same document bears the signatures of Russell Burke and the debtor.

receive the commission from any sale by Berry Hill Galleries within the time frame stated in the exchange agreement's option. *See Tr. 1* at 124, 130. Another possible explanation is that the debtor waived that right in response to the astonishment expressed by Richard York Gallery and Joseph Carroll that the "Yellow Roses" painting Dr. Carroll exchanged for the Painting had been advertised for sale by the William Verieka Gallery in *Antiques Magazine* notwithstanding Richard York Gallery's right of first refusal to consign it. *Tr. 1* at 94; *Tr. 2* at 38–39, 136. It is noted that U.C.C. § 2–209 permits contract modifications absent consideration.

Checks written by MNA&C to Carole Altman and apparently endorsed by her, *see Rafael Exh. B,* do not disclose the purchase of the Painting or any purpose. MNA&C's corresponding ledger, *see Rafael Exh. C,* also lacks illumination.

does not sell the goods, return the same to the person making delivery.

Spivey, *Consignment Transactions Under the Uniform Commercial Code*, 40 ALR 3d 1078 (1997).

■ Where there is a "true" consignment, the consignor's right to assert a claim against the consigned property prevails over the claims of the consignee's creditors. Conversely, in the absence of a true consignment, the consignee's creditors prevail. *Underwriters at Lloyds v. Shimer (In re Ide Jewelry, Inc.)*, 75 B.R. 969, 974 (Bankr. S.D.N.Y.1987); *In re Mincow Bag Co.*, 53 Misc.2d 599, 279 N.Y.S.2d 306, 308 (1967). That result recognizes the fact that a consignor is in the best position to monitor and protect the nature of the consignment by requiring the consignee to give fair notice to the public of the consignor's retained interest in the consigned goods. *See* Spivey, *Consignment Transactions Under the Uniform Commercial Code, supra.*

■ Bankruptcy does not change that result. New York has construed U.C.C. § 2–326 as it relates to consignee debtors as follows:

[i]n the event that the consignee files for bankruptcy after he takes possession of the consigned goods, ... those goods are subject to the claims of the consignee's creditors if the consignee maintains a place of business at which he deals with goods of the kind involved, and the consignor fails to perfect the security interest therein, unless the consignor's interest in those goods is readily apparent by means of a sign at the place of business.

*In re Gannon*, 173 B.R. 313, 318 n. 6 (Bankr. S.D.N.Y.1994) (citing N.Y.McKinney's Uniform Commercial Code §§ 2–326, 9–114, and 9–203(1) (1990)).

■ The record does not support a finding that the elements of a true consignment were met. Indeed, the contrary conclusion is justified. As noted, the court has already concluded the transfer to Carole Altman did not occur, but even if the debtor did sell the Painting to her, there is no evidence of a true consignment from her to the debtor. No filing statement was offered which might document Carole Altman's security interest, nor is there any evidence that a consignment notice was posted. Dr. Carroll testified that she was actually unaware of Carole Altman's consignment.[15]

The debtor testified that in the art business, it is customary not to disclose that a painting is being sold on consignment. It would have been a simple matter to offer the corroborating testimony of a colleague on the nature of the alleged trade practice.[16] The debtor has not met that burden, and research discloses that any trade practice in the art

**15.** As noted *supra* n. 10, Dr. Carroll's husband, Joseph Carroll, negotiated the transaction with the debtor. He inquired whether the Painting was consigned to the debtor, *Tr. 2* at 97, and the debtor responded that it was, without identifying the consignor. Dr. Carroll personally visited the MNA & C Gallery on September 28, 1994. *Id.* at 28. When the debtor was asked if he "ever indicate[d] to Roberta Carroll that [he] was acting as the agent for anybody," he responded "no." *Tr. 2* at 69. Although Dr. Carroll did not testify as to the basis for her knowledge that the Painting was consigned, she did not know the identity of the consignor. *Tr. 2* at 62. In addition, the debtor testified that when customers buy paintings, "[t]hey're looking at the art, and they're assuming that because the picture is on your wall, that you have the right to have it on your wall, and therefore, you have the right to sell it." *Tr. 2* at 98. He further testified that "the normal course of business in selling a painting does not require you to divulge that there is a consignor." *Tr. 2* at 127. No evidence was offered to suggest that Carole Altman did not wish to have her identity disclosed. Cumulatively, the available evidence warrants the conclusion that a consignment notice was not posted, and that creditors generally did not know that the debtor was in the business of consignment.

**16.** Evidence of trade practices is parol evidence in the sense that an inquiry goes beyond the terms of the written agreement. *See Exhs. A* and *J.* The parol evidence rule, U.C.C. § 2–202, provides that: "Terms ... intended by the parties as a final expression of their agreement ... may be explained or supplemented ... by course of dealing or usage of trade...." U.C.C. § 1–205(2) defines usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts."

The party asserting a usage of trade bears the burden of proof. *Carl Wagner & Sons v. Appendagez, Inc.*, 485 F.Supp. 762, 771 (S.D.N.Y.1980).

business pertaining to consignments appears to address a consignor's concern for privacy rather than the more general concern that a consignment relationship will be disclosed. A consignor's understandable desire for anonymity, especially with respect to the ownership of valuable works of art, could be satisfied by eliminating the name of the consignor on the displayed notice. *See Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.,* 117 A.D.2d 284, 502 N.Y.S.2d 165, 168 n. 1 (1986); Stuart Bennett, *Fine Art Auctions and the Law,* 16 Colum.-VLA J.L. & Arts 257, 257 n. 3 and 259–260 (1992); Angela Joy Davis, *Beyond Repatriation: A Proposal for the Equitable Restitution of Cultural Property,* 33 U.C.L.A. L.Rev. 642, 642 n. 5 (1985). *See also,* TAD CRAWFORD AND SUSAN MELLON, THE ARTIST-GALLERY PARTNERSHIP: A PRACTICAL GUIDE TO CONSIGNMENT at 25 (1981). The debtor's attempt to widen that concern to nondisclosure of any consignment *relationship,* as distinguished from the identity of a particular consignor, is unavailing in the absence of persuasive corroborating evidence of that industry practice.

The debtor's lack of persuasive evidence regarding the nature of the consignment is construed against him. As the debtor's attorney summarized, "[t]here is no evidence I'm aware of in the record, your honor, [other than the debtor's testimony] that [MNA & C] had a consignment right to the Painting prior to the exchange invoice with Dr. Carroll in September of [1994]." *See Tr. July 29, 1997* at 76. Therefore, it is concluded that there was not a true consignment between the debtor and Carole Altman and the Painting is property of the estate.

Even assuming *arguendo* that the conditions precedent to a true consignment of the Painting between the debtor and Carole Altman were satisfied, Dr. Roberta Carroll's subsequent reconsignment to the debtor invites the same inquiry, and warrants the same conclusion: i.e., the elements of a true consignment were not met and the Painting is property of the estate. The same result is reached even without reliance on consignment law.

### Fraudulent Transfer

As the court observed on the record, the determination of whether a transfer may be avoided is usually raised in the context of an adversary proceeding. *See* Rule 7001, F.R.Bankr.P. Notwithstanding the absence of an adversary proceeding, the parties have requested and the court has agreed to decide that issue on the basis of the trial record established here. *See Tr. August 26, 1998* at 3–7.

The definition of property of the estate under § 541(a)(3) includes interests in property which are recovered under sections 544 and 548. Section 544(b) provides for the recovery of transfers "voidable under applicable law" for holders of allowed unsecured claims.

Under controlling New York law, "[e]very conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. L. § 276 (McKinney 1990) (enacted in 1925). Actual intent need not be established by direct evidence, but may be inferred by the facts and circumstances of the case, including the "badges of fraud," which include lack of consideration, family or other close relationship, retention of possession, the financial condition of the party, whether there is a pattern of transactions made in the wake of financial difficulties, and the general chronology of the events under inquiry. *In re Kaiser,* 722 F.2d 1574, 1582–83 (2nd Cir.1983). The indicia of fraud are satisfied by a preponderance of the evidence.

The consideration for the transfers to and from Kiviat, *see supra* at 8–9, was not adequately demonstrated, that is, no documents were put in evidence which supported the debtor's claim that the transfers to Kiviat were in exchange for other paintings. As for the transfers to and from Carole Altman, again there is no evidence, other than the debtor's testimony, that a special account, *see supra* n. 5 and n. 7, ever existed, that is, no books, records, or other documents of MNA & C were produced which support the debtor's assertion. Moreover, that transfer was

to a family member, the debtor retained possession for a substantial period of time, and he kept possession of the paintings he received in exchange for the Painting. Having noted that the debtor's testimony is untrustworthy and in the absence of corroborating evidence, it is concluded that if any of the alleged Kiviat and Carole Altman transfers ever occurred, they lacked fair consideration.

Further support for a conclusion that the transfers were tainted by fraud includes the evidence that the debtor used the Painting as collateral for the Cambridge loan notwithstanding Rafael's interest. Thereafter, the debtor twice ignored Cambridge's security interest in the Painting: first when he transferred the Painting to Kiviat outside the ordinary course of business, and again when he transferred it to Carole Altman in violation of the global settlement with Cambridge. It is noted that the various transfers of the Painting occurred during pending litigation involving the Painting.

Other factors add to the analysis. It is apparent from the evidence that rather than winding up his various art galleries, as he claims, the debtor started a new gallery to sell the inventory of its immediate predecessor under a new name, sometimes at the same business address. The debtor's claim that he followed corporate formalities is supported only by his bare assertions. There are no business records in evidence for three of the debtor's four companies, apparently because the debtor, for whatever reason, *see infra* n. 17, was unable to provide them.

The inference suggested by the recounted factors is that the debtor sought to provide buyers with clear title to works of art irrespective of the security interests of others. Under the totality of those circumstances, it is apparent that the debtor intended to "hinder, delay or defraud" creditors by the various transfers of the Painting. Accordingly, the Painting is property of the estate under § 544.

The court need not address the applicability of § 548(a)(1) because the same standard applies and the same result is reached. *See, In re Stephen Douglas, Ltd.*, 174 B.R. 16, 19–21 (Bankr.E.D.N.Y.1994)

*Chapter 11 Trustee*

▪ . . . [T]he court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after the commencement of the case, or similar cause . . .; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . .

11 U.S.C. § 1104(a). The legislative history of that provision states that the court

'may order appointment only if the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.' House Report No. 95–595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, at 5787, 6358. Case law on this subject supports the view that the appointment of a trustee in a Chapter 11 case is an extraordinary remedy . . . and that interpretation is consistent with the design of Chapter 11 which mandates management by the debtor unless a party in interest is able to prove that the appointment of a trustee is warranted.

*In re BAJ Corp.*, 42 B.R. 595, 596–97 (Bankr. D.Conn.1984). Factors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence. *See In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr.E.D.Pa.1988).

▪ The debtor's argument that the requisite burden of proof is clear and convincing evidence is unavailing because the appropriate standard is a preponderance of the evidence, but even under the higher standard, Rafael prevails.

Prior to *Grogan v. Garner*, 498 U.S. 279, 286–291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), which established a preponderance of the evidence standard as the requisite burden of proof in bankruptcy litigation, clear

 

and convincing evidence was required to warrant the appointment of a trustee. *See also In re Ionosphere*, 113 B.R. 164, 168 (Bankr. S.D.N.Y.1990); *In re St. Louis Globe–Democrat, Inc.*, 63 B.R. 131, 138 (Bankr.E.D.Mo. 1985) (requiring clear and convincing evidence for trustee appointment); *In re General Oil Distributors*, 42 B.R. 402 (Bankr. E.D.N.Y.1984). Nevertheless, the decisions of some courts, which were subsequent to but did not distinguish *Grogan*, have held that a clear and convincing standard is still applicable to motions for the appointment of a trustee. *See, e.g., Cajun Electric Power Cooperative, Inc., v. Central Louisiana Electric Company, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995); *In re Aardvark, Inc.*, 1997 WL 129346, *3, (D.Del. March 4, 1997); *In re Madison Management Group, Inc.*, 137 B.R. 275, 281 (Bankr.N.D.Ill.1992). This court will follow *Grogan*, which instructed that in the absence of an express congressional direction to apply a higher standard of proof, the test should generally be the preponderance of the evidence. There is no such express intent in the language of § 1104.

It is clear that the debtor will not attempt to avoid the transfer of the Painting to Berry Hill Galleries, the likely success of which would increase the estate available to creditors. But the determination that a trustee should be appointed is justified even without a finding that the Painting is property of the estate which the debtor should have sought to recover.

It is especially significant that the debtor deliberately or negligently orchestrated the Painting's cryptic path by, *inter alia*, transferring it from gallery to gallery without any documentary record of those transfers, which obscured the identity of those who had an ownership or security interest.[17] That conduct persuasively demonstrates, even under a clear and convincing standard, "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor...." *see* § 1104(a)(1). *See also Foxley v. Sotheby's, Inc.*, 893 F.Supp. 1224, 1230 (S.D.N.Y.1995).

---

17. Rafael's attorney argued that the debtor testified at deposition that AFA and/or ABFA's business records had been lost or destroyed, including documentation of the sale to Kiviat. Upon assuring the court that the document in fact

## CONCLUSION

Accordingly, it is hereby ORDERED that a chapter 11 trustee be appointed in this case.

existed, the debtor's attorney was ordered to produce it, *see Tr. July 29, 1997* at 28, which he has not done. *See also id.* at 35, 66–67; *Tr. August 26, 1998* at 46–50.