# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 11-6020

_____

In re:  Keeley and Grabanski Land     *
  Partnership          *
          *
    Debtor         *
          *
Keeley and Grabanski Land Partnership   *    Appeal from the United States
          *    Bankruptcy Court for the
    Debtor - Appellant    *    District of North Dakota
          *
       v.        *
          *
John Keeley; Dawn Keeley;      *
Choice Financial Group       *
          *
    Petitioning Creditors - Appellees   *

_____

Submitted:  July 22, 2011
Filed: September 6, 2011

_____

Before SCHERMER, FEDERMAN, and NAIL, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

     Debtor Keeley and Grabanski Land Partnership appeals from the Order of the Bankruptcy Court[1] appointing a trustee in its involuntary Chapter 11 case.  For the reasons that follow, the Bankruptcy Court's Order is AFFIRMED.

---

    [1]  The Honorable William A. Hill, United States Bankruptcy Judge for the District of North Dakota.

# FACTUAL BACKGROUND

This appeal relates to one of two separate, but related, bankruptcy cases. The first case was a voluntary Chapter 11 case filed by Thomas and Mari Grabanski on July 22, 2010. The second case – the one particularly involved here – was an involuntary Chapter 11 case filed by John and Dawn Keeley on December 7, 2010, against the Keeley and Grabanski Land Partnership, in which the Keeleys and Grabanskis were partners. This appeal involves the appointment of a trustee in the partnership's involuntary case. However, since the decision to appoint the trustee was based in part on Thomas Grabanski's conduct in his individual case, we discuss the background of both cases here.

## *Pre-Bankruptcy Factual Background*

Thomas and Mari Grabanski are farmers living in North Dakota who own and operate several farms and other agricultural businesses. John and Dawn Keeley are also farmers living in North Dakota. On February 1, 2007, the Keeleys and Grabanskis formed a partnership, the Keeley and Grabanski Land Partnership ("KGLP"). Thomas Grabanski and John Keeley were the managing partners. Thereafter, KGLP purchased several tracts of farmland, including two large tracts in Texas referred to by the parties as the "Lenth Parcel" and the "Unruh Parcel," both of which are subject to seller-financed mortgages.

On January 1, 2008, the Keeleys and Grabanskis formed G&K Farms, a partnership which would rent farmland owned by KGLP. KGLP was to use the rents paid by G&K Farms to make the payments on the notes secured by the land. In order to conduct its farming operation in 2008, G&K Farms obtained financing from Choice Financial, which required G&K Farms to provide a blanket lien on its property, including crops. In addition, in connection with an extension of this note, Choice Financial later obtained second mortgages on the Lenth and Unruh Parcels as security

2

for G&K Farms' debt. G&K Farms also obtained credit from United Agri Products in February 2008, to pay for fertilizer for its farming operations.

The Keeleys assert that although the farms should have been profitable, Thomas Grabanski informed them in 2008 that G&K Farms had sustained a $2.5 million operating loss, despite the fact that the crops had been insured. The Keeleys assert that the Grabanskis have not accounted for this reported loss. As a result of the losses, KGLP sold its properties, except the Lenth and Unruh Parcels, in order to partially pay down G&K Farms' operating line at Choice Financial.

The Keeleys also assert that, in August 2008, Thomas Grabanski obtained $7 million in secured financing from PHI Services, Inc., on behalf of G&K Farms and other entities he was involved in. He allegedly signed the PHI agreement on behalf of G&K Farms as a co-borrower, despite a provision in the operating agreement that he could not borrow more than $1,000 without Keeley's permission. The Keeleys assert that Grabanski falsely told them that he signed this note personally, rather than for G&K Farms.

In February 2009, G&K Farms borrowed an additional $1.2 million from Crop Production Services, Inc. for the 2009 growing season. However, after planting its crop in 2009, G&K Farms discontinued operations, and the Keeleys say they have not been told where the proceeds of the crop sales or insurance proceeds from that season went.

In about May 2009, the Keeleys assert, Thomas Grabanski told them that he would pay all of G&K Farms' debt if the Keeleys would assign their partnership interest in both G&K Farms and KGLP to the Grabanskis. On September 24, 2009, the Keeleys and Grabanskis executed an Agreement to Assign Partnership Interests (the "Transfer Agreement"), wherein the Keeleys agreed to assign their partnership interests effective April 30, 2009. In the Transfer Agreement, the Grabanskis agreed

3

to pay all of both partnerships' debts, liabilities, and expenses. The Keeleys assert that they had been led to believe that the G&K Farms' crop proceeds and insurance payments would be used to pay the Choice Financial operating line of credit. As it turned out, very little of those proceeds went to pay down the Choice line.

The Keeleys assert that, in 2010, the Grabanskis abandoned G&K Farms and created a new entity, Texas Family Farms, LLC, to rent and farm the Lenth and Unruh Parcels. Despite farming the land, Texas Family Farms allegedly did not pay rent to KGLP, which in turn failed to pay the Lenth and Unruh note payments, or payments on an irrigation pivot lease for 2010. The Keeleys also assert that much of G&K's equipment has been re-titled to other Grabanski entities, traded in for other equipment, given away, or lost.

On July 7, 2010, KGLP received a letter from the U.S. Department of Agriculture Natural Resources Conservation Services ("NRCS") which indicated that the NRCS was prepared to offer $2,563,000 for the purchase of a conservation easement on 1,972 acres of the Lenth Parcel as part of a Wetlands Reserve Program.

Five days after KGLP received the offer letter from the NRCS, the Lenths sent a notice to KGLP on July 12, 2010, stating that it was in default under its promissory note and, if not made current by August 31, 2010, the Lenths would commence foreclosure proceedings as to the Lenth Parcel.

Meanwhile, after the Grabanskis and their entities defaulted on their loans from another lender, AgCountry Farm Credit Services, AgCountry obtained state court orders directing the Grabanskis to surrender AgCountry's collateral, which included the Grabanskis' and the related entities' crops and equipment. The Grabanskis allegedly disobeyed those orders, so the state court scheduled a contempt hearing for July 22, 2010, at 11:00 a.m. The Grabanskis filed a voluntary Chapter 11 bankruptcy

4

petition in their own names at 10:59 a.m that day,[2] staying that contempt hearing. Grabanski Grain, LLC, of which the Grabanskis are sole members, was also indebted to AgCountry, and filed its own Chapter 11 on July 23, 2010.[3] That case was converted to Chapter 7 on July 26, 2011.

As to the partnership which is the debtor here, KGLP, the Keeleys claim to be creditors because of their joint liability with the Grabanskis on various partnership debts. As stated, under the Transfer Agreement, the Grabanskis had agreed to satisfy all partnership debts. Nevertheless, several creditors of those partnerships sued the Keeleys to recover debts which had allegedly not been paid by the partnership. One of those creditors is PHI Financial, Inc., which asserts a debt of over $7.2 million on the loan Thomas Grabanski allegedly took on behalf of G&K Farms without Keeley's authorization. In that lawsuit, the Keeleys filed cross claims against the Grabanskis for, *inter alia*, fraud. Crop Production Services has also sued the Keeleys for nearly $800,000. Further, the Keeleys allege that despite cash flow projections which showed that Texas Family Farms would be able to raise $2.3 million from crop sales to pay off some of the debt owed to Choice, the Grabanskis only applied $100,000 to that debt, with the rest of the proceeds allegedly used for the benefit of Thomas Grabanski and Texas Family Farms. Choice has begun liquidating equipment assets on the Unruh Parcel, and has asserted that the Keeleys are liable for nearly $2 million in unpaid obligations from G&K Farms.

In October 2010, the Grabanskis' attorney informed the Keeleys of the pending foreclosure on the Lenth Parcel. Thomas Grabanski allegedly took no action on behalf of KGLP in response to the notice of intent to foreclose or notice of sale

_____

[2] *In re Thomas M. Grabanski and Mari K Grabanski*, No. 10-30902 (Bankr. D. N.D. filed July 22, 2010).

[3] *In re Grabanski Grain LLC*, No. 10-30920 (Bankr. D. N.D. filed July 23, 2010).

scheduled for December 7, 2010. So, in order to stay that foreclosure sale, the Keeleys, as creditors, initiated this case by filing an involuntary bankruptcy petition against KGLP on December 6, 2010.

### *Events in the Bankruptcy Cases*

#### *The Individual Case*

As stated, the Grabanskis filed a voluntary Chapter 11 Petition on July 22, 2010. After the Grabanskis requested three extensions for filing schedules and statements in their individual case, alleging they needed more time to respond to motions and harvest crops, the deadline was ultimately extended to September 1, 2010. On that day, the Grabanskis filed some of the schedules, but did not file Schedules C and D or a Statement of Financial Affairs until a week later. According to the Keeleys, the schedules contained significant inaccuracies, and were amended on October 20. At that time, the Grabanskis disclosed an additional eleven personal vehicles, $831,818.56 in secured debt, and $17 million in unsecured debt. Parties have alleged that the schedules are still not accurate.

Meanwhile, at least five creditors, including PHI, Crop Production Services, and AgCountry, have filed adversary actions against the Grabanskis for, *inter alia*, providing false financial statements in connection with their loans. The Keeleys have also filed an adversary proceeding alleging that Thomas Grabanski fraudulently transferred partnership assets, crop proceeds, and crop insurance for his own benefit and the benefit of his other farming operations. The Keeleys also assert that Grabanski misrepresented the true financial picture of the two partnerships in order to deprive the Keeleys of their partnership interests.

On August 2, 2010, AgCountry moved to appoint a trustee in the individual case, pointing to fraud in connection with its collateral, as well as dishonesty,

incompetence, and gross mismanagement on the part of Thomas Grabanski.[4] At least three other creditors joined that motion. The Grabanskis requested an extension of time to respond to that motion, again due to needing to respond to other motions and also to harvest crops. The Grabanskis and AgCountry resolved that dispute by agreeing, *inter alia*, that Thomas Grabanski and the Grabanskis' bookkeeper, Jennifer Tibert, submit to a Rule 2004 exam. According to AgCountry, the Grabanskis made several requests to postpone the Rule 2004 exams, each time alleging that either Thomas Grabanski or Ms. Tibert was too sick to attend. Ultimately, the Grabanskis filed formal requests for extension of the exams, asserting that both Ms. Tibert and Thomas Grabanski were suffering from mental health problems as a result of these and related proceedings.[5] Thomas Grabanskis' last motion requested a protective order staying the Rule 2004 exam indefinitely because he was suffering from depression and stress, and prohibiting AgCountry from filing any "punitive motions."

In response to the formal requests for extension, the Bankruptcy Court continued the Rule 2004 exams of Thomas Grabanski and Ms. Tibert for 14-day periods, but refused to permit further continuances without evidence from health care professionals that they were unable to competently take part in Rule 2004 examinations. The Court denied the request for a protective order as to Thomas Grabanski. According to the Trustee, when the Rule 2004 exams were held, Ms. Tibert testified that she helped prepare the original schedules, but not the amended schedules. Thomas Grabanski testified that he could not recall preparing the schedules or amended schedules, and could not vouch for the accuracy of the documents.

---

[4] AgCountry also alleged that, in a discovery deposition taken in January 2010, Thomas Grabanski had asserted his Fifth Amendment privilege and refused to testify regarding the location and disposition of AgCountry's collateral.

[5] AgCountry asserted that Ms. Tibert participated in the conspiracy to convert and hide AgCountry's collateral in violation of the state court orders to surrender the collateral to AgCountry.

7

On November 22, 2010, the Grabanskis moved to extend the exclusivity period for filing a plan and soliciting its acceptance. The Grabanskis alleged, among other things, that they were working on a settlement with AgCountry that would free up money for the unsecured creditors and that they intended to file a plan and disclosure statement "on or before January 7, 2011." AgCountry objected, stating the Grabanskis' request was not in good faith because they had made no attempt to negotiate or file a plan; had failed to produce fundamental facts and information; had refused to testify in good faith at the Rule 2004 examination; had not shown that they were paying bills when they come due; and had failed to file required monthly accounting reports. The Keeleys also objected on the ground that the Grabanskis were withholding documents and information and had asked the Keeleys to preferentially transfer partnership property to Thomas Grabanski's father, Merlin Grabanski. On December 21, 2011, the Bankruptcy Court granted the Grabanskis' motion and extended the exclusivity period for filing a plan and disclosure statement until January 7, and for soliciting acceptances until March 6, 2011.

The January 7 deadline passed without a plan or disclosure statement being filed. At a hearing on January 12, the Bankruptcy Court ordered the Grabanskis to file a plan and disclosure statement no later than January 26 as a condition for continuing AgCountry's stay relief motion. On January 25, 2001, rather than filing a plan and disclosure statement, the Grabanskis filed a "Plan of Debtors-in-Possession Regarding Motion of AgCountry Farm Credit Services PCA for Relief from Automatic Stay." That "plan" stated only why the court should leave the automatic stay in place — it contained none of the elements of a plan required under 11 U.S.C. § 1123, nor was it accompanied by a disclosure statement as required under 11 U.S.C. § 1125.

On March 6, 2011, the Grabanskis filed a "Motion to Extend Period for Debtors to Solicit Acceptance of Plan," claiming to have made significant progress toward producing a feasible plan of reorganization by agreeing to sell property. They also

argued that "favorable resolutions with secured creditors are in reality a condition precedent to producing a confirmable, feasible plan."

The United States Trustee, the Keeleys, and other creditors[6] objected, arguing the Grabanskis (1) had no plan for which to solicit acceptances, (2) had not filed a disclosure statement, (3) had not filed amended schedules, (4) were striking side deals with separate creditors instead of proposing solutions to all creditors through the plan process, and (5) had shown no proof of the alleged progress in developing a feasible plan. In addition, the Grabanskis were attempting to obtain a *de facto* extension of the exclusivity period by obtaining an extension of time for gaining acceptances, in violation of § 1121(d)(1) of the Bankruptcy Code.[7]

By Order entered March 30, 2011, the Bankruptcy Court denied the motion to extend the exclusivity period and ordered that, unless a plan and disclosure statement were filed within fifteen days, the case would be dismissed. The Grabanskis appealed that Order. The Bankruptcy Court stayed the Order in that case pending the outcome of the appeal.[8]

---

[6] These creditors included the Hanson-Tallackson Parties, PHI Financial Services, Inc., and Horse Creek Farms.

[7] That section requires that a request for an extension of the exclusivity period be made within such period. 11 U.S.C. § 1121(d)(1).

[8] By separate Order, we are dismissing that appeal because the Order denying the extension of the exclusivity period is not a final Order. *See In re Zahn*, 526 F.3d 1140 (8th Cir. 2008) (holding that an order denying confirmation of a plan, without dismissal of the case, is not an appealable final order).

*The Partnership Case*

As stated above, on December 6, 2010, the Keeleys filed an involuntary petition against KGLP to stop a foreclosure on the Lenth Parcel. When no Answer was filed, the Bankruptcy Court entered an Order for Relief on January 7, 2011. On January 10, 2011, KGLP moved to dismiss the case, asserting, *inter alia*, that the Keeleys were no longer partners in KGLP, and that any claim they may have against the Debtor was subject to bona fide dispute as to liability or amount. The Keeleys opposed the dismissal. On July 8, 2011, the Bankruptcy Court denied the motion to dismiss, on the ground that it was untimely filed.

On February 3, 2011, the Keeleys moved for the appointment of an operating trustee in the KGLP case. They alleged the Grabanskis fraudulently transferred assets out of the partnership and concealed liabilities in order to have the partnership incur additional debt for the Grabanskis' personal benefit. They further pointed out that G&K Farms had had significant operating losses under Thomas Grabanski's direction, despite guaranteed income from crop insurance, and that the Grabanskis had not demonstrated why the farms reported operating losses. They also alleged that several of the creditors in the Grabanskis' individual case had accused Thomas Grabanski of fraud and, indeed, several creditors filed adversary proceedings in that case. KGLP opposed the appointment of a trustee and, following a hearing, the Court entered an Order on February 25, 2011, denying the motion, but expressly authorizing the Keeleys to renew the motion at a later time.

On March 22, 2011, the Keeleys filed a second motion to appoint a trustee. This time, in addition to the allegations of fraud and misconduct cited before, the Keeleys asserted that circumstances surrounding an offer to purchase KGLP's land necessitated the appointment of a trustee.

Specifically, they alleged that Mr. Kalin Flournoy, who Thomas Grabanski had hired in May 2009 to sell KGLP's farms, had received an offer in March 2011, from U.S. Farming Realty Trust, L.P., to purchase the Lenth and Unruh Parcels for $3.5 million and $4.5 million, respectively. The offers included a provision that KGLP, or a lessee designated by KGLP, could option to lease the land from the buyer after the sale. The offers even allowed KGLP to retain possession of the 2011 winter wheat crop currently growing on the Unruh Parcel and provided the partnership the right to enter upon the land for harvest. On March 10, 2011, U.S. Farming allegedly revised its offer to include $250,000 in earnest money for each parcel. According to the Keeleys, U.S. Farming was a reputable company with the wherewithal to accomplish the transaction. However, on or about March 18, 2011, Thomas Grabanski and related parties allegedly began planting corn on the Lenth Parcel, apparently in an attempt to dissuade U.S. Farming from pursuing its offer further, as well as to enjoy farming the property for a second growing season without any associated land costs. Despite requests from the Keeleys, Thomas Grabanski refused to respond to U.S. Farming's offer, even though, the Keeleys assert, accepting it would generate approximately $2.6 million in equity beyond the first mortgages that could be used to pay creditors. They asserted that if KGLP allowed the Lenths and Unruhs to foreclose upon the properties, this equity, which could be available to pay creditors, would be lost. Also, Grabanski refused to respond even though he had previously expressly agreed to sell the Lenth Parcel if an offer for $3.5 million was received, which is the exact amount of the offer from U.S. Farming.[9] Flournoy testified at the hearing that, after listing the Unruh Parcel for $4.5 million, Grabanski asked him to raise the price to $6.5 million and told Flournoy that he intended to lease it back from KGLP for two years. Flournoy said he refused to raise the price because it would virtually make the farm unsellable in that, at that price, the buyer would not be able to rely on lease payments alone to make

---

[9] As part of the 2010 extension of the Choice Financial line of credit, Thomas Grabanski, on behalf of G&K Farms, expressly agreed with Choice that the Lenth Parcel would be sold if an offer of $3.5 million was made on it, with any equity proceeds being used to pay down the Choice loans.

the loan payments on the farm. Flournoy testified that one possible reason for this unreasonable increase in price was that Grabanski had purchased adjacent land.

The United States Trustee joined in the motion for appointment of a trustee because the Grabanskis were unduly delaying the administration of KGLP's estate. In addition, creditors Choice Financial Group and Earl and Lenita Unruh joined the motion. The Lenths opposed the motion, essentially because there was a pending motion to dismiss the case, and they preferred to proceed with their foreclosure. The Lenths also stated that, although the Keeleys were saying there was an offer on the table, they would not disclose details and that this made their position suspect.

At the hearing held on March 30, 2011, the Bankruptcy Court considered both the Grabanskis' request for extension of the exclusivity period in their own case, and the motion to appoint a trustee in the KGLP case. As state above, the Court denied the Grabanskis' request to extend the exclusive solicitation period because they had no plan and the exclusivity period for filing a plan had lapsed on January 7.

The Bankruptcy Court then found cause to appoint a trustee in the KGLP case. The court stated, "I think it is time now to move forward with this case and either be successful in the chapter 11 reorganization or simply dismiss the case." The court concluded that the Grabanskis' history of unreasonable delay warranted the appointment. KGLP appeals.

## DISCUSSION

### *Standard of Review*

We review the Bankruptcy Court's factual findings for clear error and its conclusions of law *de novo*.[10]

---

[10] *In re Wiley*, 288 B.R. 818, 821 (B.A.P. 8th Cir. 2003).

## *Appointment of Chapter 11 Trustee*

Section 1104(a) of the Bankruptcy Code provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.[11]

The appointment of a trustee in a Chapter 11 case is an extraordinary remedy.[12] And, "there is a strong presumption in favor of allowing a chapter 11 debtor-in-possession to remain in possession."[13]

---

[11] 11 U.S.C. § 1104(a).

[12] *In re Veblen West Dairy LLP*, 434 B.R. 550, 553 (Bankr. D. S.D. 2010) (citing *Adams v. Marwil* (*In re Bayou Group, LLC*), 564 F.3d 541, 546 (2d Cir. 2009); *In re AG Service Centers, L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999)).

[13] *Id.* (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3rd Cir. 2003); *AG Service Centers, L.C.*, 239 B.R. at 550).

The parties moving for the appointment of a trustee bear the burden of proof.[14] As the parties here point out, however, courts disagree on to the extent of that burden. While the majority of courts have concluded that the movant must meet its burden with clear and convincing evidence,[15] those courts rely largely on a prior decision of the Third Circuit, *In re Sharon Steel Corp.*,[16] and its progeny.[17] Significantly, after *Sharon Steel* was decided, the Supreme Court decided *Grogan v. Garner*,[18] which specifically considered the standard of proof required in a bankruptcy case. There, the Supreme Court said:

> Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless "particularly important individual interests or rights are at stake." We have previously held that a debtor has no constitutional or "fundamental" right to a discharge in bankruptcy. We also do not believe that, in the context of provisions designed to exempt certain claims from discharge, a debtor has an interest in discharge sufficient to require a heightened standard of proof.[19]

---

[14] *Id.*

[15] *See, e.g., In re Bayou Group, LLC*, 564 F.3d at 546-47; *Official Comm. of Asbestos Claimants v. G–I Holdings, Inc. (In re G–I Holdings, Inc.)*, 385 F.3d 313, 317-18 (3rd Cir. 2004); *In re Sundale, Ltd.*, 400 B.R. 890, 899-900 and 900 n. 8 (Bankr. S.D. Fla. 2009), and cases cite therein.

[16] 871 F.2d 1217, 1225 (3d Cir. 1989).

[17] *E.g., In re Adelphia Communications Corp.*, 336 B.R. 610 (Bankr. S.D. N.Y. 2006).

[18] 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

[19] *Id.* at 286, 111 S.Ct. 654 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983); *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979); *United*

As the court in *Veblen West Dairy* said, while a Chapter 11 debtor's desire to remain in possession of the property of the bankruptcy estate and in control of its reorganization is certainly an important interest, that interest cannot reasonably be said to be any more important than a Chapter 7 debtor's interest in receiving a discharge of his debts.[20] We agree: If a preponderance of the evidence standard is a sufficient standard for the denial of discharge based on a debtor's fraud, it should likewise be sufficient for the appointment of a trustee based on allegations of the debtor's fraud or misconduct. Consequently, we conclude that the proper standard for a party seeking the appointment of a Chapter 11 trustee is preponderance of the evidence.

That being said, we conclude that the Bankruptcy Court did not clearly err in ordering the appointment of a trustee, even if the higher clear and convincing standard of proof applied.

The bankruptcy court has discretionary authority to determine whether cause exists for the appointment of a trustee under § 1104(a)(1).[21]

---

*States v. Kras*, 409 U.S. 434, 445-446, 93 S.Ct. 631, 637-638, 34 L.Ed.2d 626 (1973)).

[20] *In re Veblen West Dairy,* 434 B.R. at 555. *See also Tradex Corp. v. Morse*, 339 B.R. 823, 829 (D. Mass. 2006) ("[F]actual findings for appointment of a trustee must be made to a preponderance of the evidence by the appointing judge, and should be reviewed under a clearly erroneous standard, while the determination that such evidence is sufficient to show cause for appointment will be evaluated for an abuse of discretion."); *In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999) (holding that, following *Grogan v. Garner*, the appropriate standard of proof for appointment of a Chapter 11 trustee is preponderance of the evidence), *vacated on other grounds*, 254 B.R. 509 (D. Conn. 2000).

[21] *In re Veblen West Dairy*, 434 B.R. at 553.

Considerations include the materiality of any misconduct, the debtor-in-possession's evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets. If cause is found, the appointment of a trustee is mandatory.[22]

KGLP asserts that the sole basis for the Keeleys' request for appointment of a trustee is KGLP's refusal to accept purchase offers on its land, from which, KGLP asserts, the Keeleys seek a pecuniary benefit. In other words, KGLP asserts that the Keeleys' goal here is to cash out equity from KGLP's Texas land, even though the Keeleys no longer have a partnership interest in KGLP.

To the contrary, however, the Keeleys, as well as the U.S. Trustee and other creditors, asserted several grounds for appointment. The record shows that many parties are asserting that the Grabanskis have engaged in fraud in connection with KGLP and their other entities. And, the parties allege that the Grabanskis, or entities they own or control, have been farming KGLP's land without paying rent, and that the Grabanskis are now leasing the land for less than market value,[23] which is why KGLP is unable to service its debt.

KGLP is significantly delinquent on its obligations to the sellers of both the Lenth and Unruh properties and, indeed, the Keeleys filed this case to stop a foreclosure on the Lenth Parcel. The Unruhs were also seeking to foreclose. The Debtor is also delinquent on the 2010 real estate taxes, as well as an obligation to

---

[22] *Id.* (citations omitted).

[23] Thomas Grabanski testified at his 2004 exam that one Louis Slominski, Jr. was leasing the Unruh Parcel under a verbal lease, but admitted that the rent received was insufficient to service the outstanding debt on the property.

Irrigation Finance Solutions, LLC, for irrigation pivots constructed on the Lenth Parcel under a lease to purchase agreement. Irrigation Finance Solutions is threatening to repossess the irrigation pivots, which add significant value to the Lenth Parcel.

Yet, despite the fact that KGLP cannot service its debts, and has in fact been marketing its property for sale, the parties allege that Thomas Grabanski, as KGLP's managing member, refused to accept what Mr. Flournoy, KGLP's own marketing agent, testified is a reasonable offer on the land.[24] In conjunction with the allegation that the Grabanskis have farmed the land without paying rent, the refusal of a reasonable offer to purchase the land, which KGLP itself put on the market, supports the conclusion that the Grabanskis are sabotaging attempts to sell, and are, it would appear, engaging in self-dealing.

Moreover, even putting the allegations of fraud aside, the Bankruptcy Court's and U.S. Trustee's concern that neither KGLP, nor Thomas Grabanski, has any motivation to keep this case moving is well-founded. As shown above, Thomas Grabanski has proven himself unable or unwilling to move his own individual case along in a meaningful manner. And, given the numerous lawsuits and adversary proceedings pending against the Grabanskis and their other entities, and his own contention that he is suffering from depression and stress, it was reasonable to

---

[24] We note that KGLP asserts that the Bankruptcy Court should not have allowed Mr. Flournoy to testify at the hearing because he did not qualify as an expert and KGLP had not been given advance notice of his testimony. However, Mr. Flournoy was KGLP's own marketing agent, and he testified about his dealings with Thomas Grabanski, so there should have been no surprise regarding his testimony. He also testified regarding his own personal knowledge of the marketing of the property. His testimony about reasonable prices in the market for farmland was within his range of knowledge and experience as a property broker and farmer. We therefore reject KGLP's argument that the Bankruptcy Court erred in considering his testimony.

conclude that he is unable to devote sufficient attention to KGLP. Further, the significant unexplained operating losses of G&K Farms, which was supposed to support the loan payments on KGLP's land obligations, strongly suggests mismanagement on the part of Thomas Grabanski. The appointment of a trustee allows KGLP to be operated without the distractions and other motivations plaguing Thomas Grabanski.

In light of all of the allegations and evidence in this case, the Bankruptcy Court was not clearly erroneous in finding that cause existed to appoint a trustee under § 1104(a)(1).

The Bankruptcy Court may also appoint an operating trustee under § 1104(a)(2) if that appointment "is in the interests of creditors, and equity security holders, and other interests of the estate."[25] Among the factors courts consider in determining whether to appoint a chapter 11 trustee under § 1104(a)(2) are: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment.[26] A Bankruptcy Court has particularly wide discretion to appoint a trustee under the flexible standard of § 1104(a)(2) of the Bankruptcy Code, even when no cause exists under § 1104(a)(1).[27]

For the same reasons cited above, we also conclude that interests of creditors and the estate warrant the appointment of a trustee under § 1104(a)(2). The

---

[25] 11 U.S.C. § 1104(a)(2).

[26] *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164,168 (Bankr. S.D. N.Y. 1990); *see also In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990).

[27] *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).

trustworthiness of KGLP's principals has been seriously questioned; KGLP's past performance casts serious doubt on its prospects of reorganization if left under the direction of Thomas Grabanski; and the evidence suggests that the business community and creditors have lost all confidence in Thomas Grabanski's ability to manage KGLP's affairs. Indeed, the only creditor who spoke against the appointment of a trustee, the Lenths, did so because they preferred dismissal and foreclosure. KGLP's own real estate agent essentially testified that he has lost confidence in Thomas Grabanski. As the Bankruptcy Court did, we recognize that the appointment of a trustee involves costs, but the evidence suggests that the benefits from the appointment outweigh the costs in this case. Consequently, the Court did not clearly err in finding that the appointment of a trustee is in the interests of creditors and the estate under § 1104(a)(2).

We recognize that many of the allegations against the Grabanskis, particularly regarding their misconduct, had not yet been proven when the Bankruptcy Court ordered the appointment of the trustee. However, the allegations are sufficiently serious and widespread to warrant consideration by the Bankruptcy Court in appointing a trustee. Further, even if the Grabanskis were to prevail in the adversaries and other actions against them, the Grabanskis will have to focus their attention on those matters. Given the fact that they have been consistently unable to timely comply with their duties in their individual case due to having to attend to ongoing business operations and illness, and with the added pressures of the adversary proceedings, the Bankruptcy Court did not err in finding that the Grabanskis will not be able to effectively perform their duties as principals in the KGLP case.

Finally, KGLP also asserts that it is inappropriate to appoint a trustee for the purpose of liquidating a debtor's assets, pointing out that liquidation is omitted from the list of duties under § 1106. However, § 1106(a)(5) permits a trustee to file a plan, and § 1123(b)(4) states that a plan may "provide for the sale of all or substantially all of the property of the estate." And, again, Thomas Grabanski, on behalf of KGLP,

19

already has listed its properties for sale. Consequently, we reject this argument as a basis for reversal.

Since the record supports a finding of cause under § 1104(a)(1), and that the appointment of a trustee is in the interests of creditors and the estate under § 1104(a)(2), the appointment of the trustee was mandatory. The Bankruptcy Court's Order is, therefore, AFFIRMED.

---